# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **KHALIL SMITH** | : | **No. 15-180-1** |
| **MARK WOODS** | : | **No. 15-180-2** |
| **TERRANCE MUNDEN** | : | **No. 15-180-5** |
| **ROBERT HARTLEY** | : | **No. 15-180-6** |
| **LEVERN JACKSON** | : | **No. 15-180-8** |

**Goldberg, J.**                                                  **July 18, 2018**

## <u>Memorandum Opinion</u>

From September of 2012 through April of 2014, Defendants Khalil Smith, Mark Woods, Terrance Munden, Robert Hartley, Levern Jackson, and others engaged in a rampage aimed at ambushing and robbing drug dealers. These acts included armed home invasion robberies, kidnappings, and carjackings, and involved the use of GPS tracking devices, police scanners, and an array of firearms. Often, Defendants beat and tortured their victims in order to learn the location of drugs and drug proceeds. On one occasion, Defendants targeted the wrong house, violently assaulting an innocent couple and threatening to sexually assault the pregnant wife. And on another occasion, one of Defendants' cohorts was shot and killed by a home owner.

Defendants were charged in a multi-count indictment, and on April 19, 2017, were convicted by a jury on multiple counts of Hobbs Act robbery, attempted Hobbs Act robbery, kidnapping, carjacking, and brandishing a firearm while committing the other offenses. Defendants were also found guilty of participating in a single overarching conspiracy that covered eleven separate incidents. The jury's verdicts were not surprising because the evidence presented by the Government was substantial and compelling.

All Defendants have moved for a mistrial premised on various alleged <u>Brady</u> violations that occurred during the trial. I held this Motion under advisement until post-verdict motion briefing could be completed. Defendants have also filed motions pursuant to Federal Rules of Criminal Procedure 29, 33, and 34.

For the reasons that follow, I will deny all of Defendants' Motions.

## I. PROCEDURAL BACKGROUND

On April 28, 2015, a federal grand jury returned a seventeen-count indictment charging the five Defendants named here, as well as eleven co-defendants.[1] The grand jury subsequently returned a thirty-count superseding indictment on May 26, 2016, charging the original Defendants and adding the following four Defendants: Sei Stone, Edwin Robinson, Louis Miller, and James Haines. Marcus Bowens, Michael Queen, Daniel Hayes, Jeffrey Bellamy, and Eric Scott entered into cooperation plea agreements with the Government prior to the filing of the superseding indictment, and Louis Miller entered a cooperation plea agreement thereafter.

Both the original indictment and superseding indictment charge conspiracy "[f]rom in or about September 2012 through April 29, 2014," in violation of the Hobbs Act, 18 U.S.C. § 1951(a). The superseding indictment charges eleven incidents as part of the conspiracy, as well as one independent incident, amounting to twelve total incidents.[2] These incidents were alleged in separate counts as follows:

---

[1] The original indictment named the following Defendants: Khalil Smith, Mark Woods, Marcus Bowens, Michael Queen, Terrance Munden, Robert Hartley, Hasan Chaney, Levern Jackson, Braheim Ballard, William Jefferson, Daniel Hayes, Jamal Doggett, Jeffrey Bellamy, Romel Anthony, Eric Scott, and Brandon Segers.

[2] Specifically, the original Defendants were indicted on charges of conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) (one count); interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2 (two counts); attempted interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) (four counts); carjacking in violation of 18 U.S.C. § 2119 (two counts);

- An armed home invasion robbery on September 3, 2012 (Counts Two and Three) ("Railroad Avenue");

- An attempted possession with intent to distribute cocaine on September 11, 2012 (Counts Four and Five) ("Bristol Street");

- An attempted armed home invasion robbery on October 9, 2012 (Counts Six and Seven) ("Cherry Hill");

- An attempted armed robbery on July 15, 2013 (Counts Eight and Nine) ("Platinum Jewelers");

- A kidnapping, carjacking, and armed home invasion robbery on October 18 and 19, 2013 (Counts Ten, Eleven, Twelve, Thirteen, and Fourteen) ("Master Street");

- An armed home invasion attempted robbery on November 7, 2013 (Counts Fifteen, Sixteen, and Seventeen) ("Leas Way");

- An armed home invasion robbery on December 28, 2013 (Counts Eighteen and Nineteen) ("Lansford Street");

- An armed home invasion robbery on January 27, 2014 (Counts Twenty and Twenty-One) ("Pulaski Avenue");

- An armed kidnapping on March 19, 2014 (Counts Twenty-Two and Twenty-Three) ("Mayfair Street");

- An armed home invasion attempted robbery and carjacking on April 16, 2014 (Counts Twenty-Four, Twenty-Five, and Twenty-Six) ("Regent Street");

---

attempted possession with intent to distribute cocaine in violation of 21 U.S.C. § 846 (one count); and using or carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2 (seven counts).

On May 26, 2016, Smith, Woods, Munden, Hartley, and Jackson, along with other co-defendants, were charged in a superseding indictment with conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) (one count); interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2 (five counts); attempted interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) (five counts); carjacking in violation of 18 U.S.C. § 2119 (three counts); kidnapping in violation of 28 U.S.C. § 1201(a)(1) (two counts); attempted possession with intent to distribute cocaine in violation of 21 U.S.C. § 846 (one count); and using or carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2 (thirteen counts).

- An armed home invasion robbery on April 24, 2014 (Counts Twenty-Seven and Twenty-Eight) ("Ridge Avenue"); and

- An armed home invasion attempted robbery on April 29, 2014 (Counts Twenty-Nine and Thirty) ("Wyndale Avenue").

Smith, Woods, Munden, Hartley, and Jackson proceeded to trial on January 31, 2017 in "Phase I" of this case.[3]  Woods insisted on representing himself but maintained the assistance of back-up counsel throughout the trial.  The eleven-week trial began on January 31, 2017 and concluded on April 17, 2017.  With a few exceptions, the jury returned guilty verdicts against all Defendants on April 17, 2017.[4]

---

[3]  Given the large number of Defendants, and courtroom management and safety concerns, one trial with all Defendants was not feasible.  Consequently, by Order of the Chief Judge of this district, the case was split into three trial phases.

Hasan Chaney, Braheim Ballard, William Jefferson, Jamal Doggett, Brandon Segers, Sei Stone, Edwin Robinson, and James Haines were reassigned to another Judge on this Court for Phase II.  Defendants Jefferson, Doggett, Stone, and Haines pled guilty prior to trial, and Defendants Chaney, Ballard, Segers, and Robinson proceeded to trial on September 6, 2017. The jury returned a partial verdict on October 18, 2017, convicting Defendants Chaney, Ballard, and Segers on one count each.  Robinson was found not guilty on one count, and the jury was unable to reach a unanimous decision on the other two counts with which he was charged; thus a mistrial was declared as to those counts.  Robinson was scheduled to be retried in the spring of 2018 before me, however, pled guilty prior to the retrial.

Defendant Anthony, who is not charged in Count One, proceeded to trial before me on June 4, 2018 in Phase III.  On June 11, 2018, he was found guilty on Count Four and not guilty on Count Five.

[4]  Smith was found guilty on Counts One, Two, Three, Six, Seven, Eight, Nine, Fifteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Four, Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, and Thirty.

Woods was found guilty on Counts One, Six, Seven, Ten, Eleven, Twelve, Thirteen, Fourteen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Four, Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, and Thirty.

Munden was found guilty on Counts One, Ten, Eleven, Twelve, Thirteen, Fourteen, Twenty-Two, Twenty-Four, Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, and Thirty.

## II. FACTUAL BACKGROUND

### A. Overview of the Twelve Incidents

The twelve incidents charged include five armed robberies, five attempted armed robberies, two kidnappings, three carjackings, and one attempted possession with intent to distribute cocaine. Generally, with Smith and sometimes Woods acting as leaders, Defendants solicited information regarding the location of drugs and money kept by drug dealers and then devised plans to steal from the dealers. The details of the twelve incidents were presented to the jury through the testimony of cooperating witnesses, victim witnesses, law enforcement officers, and the presentation of substantial physical evidence. A brief overview of each incident follows.

#### 1. Railroad Avenue (Counts Two and Three)

Cooperating witness Eric Scott testified that in the summer of 2012 he informed Smith that a girl he was dating and her mother were dealing drugs out of their home on Railroad Avenue in Ambler, Pennsylvania. Smith, Scott, and Jefferson planned the home invasion beginning in the summer of 2012. On the evening of September 2, 2012, Scott went to the house and spent the night, notifying Smith and Jefferson via cell phone the next day when they should enter the house. Scott, now posing as a victim, unlocked the front door and three men wearing partial masks and carrying guns entered the home around 12:50 p.m.

Inside of the home with Scott were C.W., the homeowner, her daughter (and Scott's girlfriend) A.G., her son D.W., and her son's friend T.H. C.W. and A.G. testified that the three men pointed guns at them, directed them to lie on their beds, and then secured them with shoelaces. Demanding money and drugs, and hunting through drawers and purses, the men

Hartley was found guilty on Counts One, Twenty-Two, Twenty-Four, Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, and Thirty.

Jackson was found guilty on Counts One, Twenty, Twenty-One, and Twenty-Two.

warned C.W. that if she did not cooperate they would harm the other people in the home. The men fled after taking jewelry, cocaine, and Percocet pills. A.G. identified Smith as one of the perpetrators when she was later interviewed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").

2.  Bristol Street (Counts Four and Five)

Philadelphia police officers testified that Smith and Scott were observed on the rooftop of a building on the 4300 block of N. 5th Street on September 11, 2012, which prompted a call to the police. When the police arrived, Smith and Scott ran from the rooftop but were stopped and arrested by the police, along with Jefferson who had been on the roof as well.

Officers testified that they recovered from the scene two black masks, a black baseball hat, a bag containing a pair of jeans, and a laundry bag containing a quilt and black mask. Additionally, the owner of the building on which Smith and Scott were observed found two loaded firearms on the roof, as well as a bag containing a crowbar and other items. DNA testing revealed Smith's DNA on one of the firearms.

Scott testified that Smith, Jefferson, and he were on the roof conducting surveillance of a target they planned to burglarize. Anthony and Bowens were waiting nearby as lookouts. The plan was to steal cocaine and a large sum of cash that they believed were inside of the target's home. Cooperating witness Marcus Bowens confirmed this plan.

3.  Cherry Hill (Counts Six and Seven)

Bowens testified that on October 9, 2012, Smith, Jefferson, and Haines drove to the Bishops View Apartments in Cherry Hill, New Jersey with the intention of committing an armed robbery of H.H. Woods met them there and stayed in his vehicle as a lookout while Smith, Jefferson, and Haines approached the home of H.H. armed with a firearm. At approximately

8:50 a.m., H.H. woke up to a sound coming from his living room. Upon entering the living room, H.H. noticed that a window near the front door was open and the blinds were moving. He returned to bed, but again heard a sound and returned to the front window, observing a male with his hands inside of the window's screen. H.H. saw two other men standing near the first man, one of whom had a firearm in his waistband, and H.H. shouted "I see you." The three men then fled.

H.H. reported the incident to the police, providing descriptions of the men and a vehicle in which the men fled. The police observed that the window screen had been cut and the lock on the window was pried open. Other police units stopped the vehicle described by H.H. and brought H.H. to the scene of the stop for a "show up" of the vehicle's occupants (Smith, Jefferson, and Haines). H.H. identified Jefferson as the man who had the gun in his waistband. Smith, Jefferson, and Haines were arrested and charged with robbery, burglary, and related offenses in New Jersey state court. A search of the vehicle uncovered a loaded firearm, a GPS tracking device, a police scanner, three pairs of gloves, and four cell phones.

### 4. Platinum Jewelers (Counts Eight and Nine)

Cooperating witnesses Bowens, Daniel Hayes, and Jeffrey Bellamy all testified that while wearing disguises, Segers and Hayes entered Platinum Jewelers, a store located on Market Street in Philadelphia, at approximately 11:45 a.m. on July 15, 2013. Once inside, Segers and Hayes talked with store employees and pretended to be customers. Meanwhile, cooperators Bellamy and Michael Queen, and another conspirator Anthony McFarland (killed in a later incident), waited outside serving as lookouts and/or getaway drivers. Wearing vests that said "Police" on the front and masks, Smith and Bowens entered the store shortly after Segers and Hayes and shouted, "Police." A female employee pressed the panic alarm beneath the counter

and Smith pulled out his gun and approached her behind the counter, saying "Bitch did you hit the alarm." The four men then fled the store and the area without stealing any items.

A video of this incident was shown multiple times at trial and Bowens, Queen, and Hayes each identified the four men in the video.

5. <u>Master Street (Counts Ten, Eleven, Twelve, Thirteen, and Fourteen)</u>

Cooperating witness Louis Miller testified that on October 18 and 19, 2013, Woods, Munden, Chaney, and he went to the 3000 block of Master Street in Philadelphia to look for G.T., a drug dealer they planned to rob. The four men watched G.T. walk toward his car and approached him purporting to be police officers. They frisked G.T., took money from his wallet, took his car keys and cell phone, and demanded to know where he stored his drugs and drug proceeds. When G.T. attempted to escape, the four men assaulted him, forcing him into the back of Chaney's vehicle where they bound his ankles and covered his head. Woods, Munden, Chaney, and Miller then transported G.T. to Munden's garage and held him there for several hours while they continued to beat him and demanded information regarding the location of drugs and drug proceeds.

Miller testified that G.T. was eventually moved to Miller's garage where he was forced to contact another drug dealer named S.P. As a ruse, the captors forced G.T. to tell S.P. that he was going to stop by his apartment. Instead of G.T., Woods, Munden, and Miller (along with a non-indicted co-assailant, Charles Wardlaw) went to S.P.'s apartment. The men waited for S.P. to open his door, and when he did, confronted him with guns drawn and forced him back into his apartment. Once inside, the men assaulted S.P. and stole cocaine, money, and other items of value before fleeing the apartment. G.T. was later released on October 19, 2013 at another location where he was left handcuffed to the armrest of his own vehicle.

6. Leas Way (Counts Fifteen, Sixteen, and Seventeen)

Bowens and Queen testified that on November 7, 2013, Smith, Bowens, Queen, Ballard, and Doggett met in the parking lot of the Cheltenham Mall and drove to Hatfield, Pennsylvania to rob a drug dealer named M.M. who they had been monitoring for weeks. Bowens and Queen explained that Doggett served as lookout and informed the others, who were lying in wait, when M.M. was approaching his home. Smith, Bowens, Queen, and Ballard approached M.M. as he pulled into his driveway, pointing their guns at him and threatening him. They then took M.M.'s car keys and subdued him before bringing him into his home. After restraining and assaulting M.M., the men ransacked the house, taking electronics, firearms, and personal items. Leaving M.M. restrained, Bowens testified that the men packed M.M.'s BMW with the stolen items and Bowens drove off in the car. Bowens abandoned the BMW on the highway when it ran out of gas, but not before taking a backpack containing a laptop computer, cellphones, and money from the vehicle.

7. Lansford Street (Counts Eighteen and Nineteen)

Bowens and Bellamy testified that they met with Smith, Woods, Stone, and Robinson on Lansford Street in Philadelphia on December 28, 2013 to rob a drug dealer named T.H. Bowens and Bellamy stayed outside as lookouts as Smith, Woods, Stone, and Robinson broke into T.H.'s home dressed in dark clothes and wearing masks. R.H., T.H.'s brother, testified that he was inside on the lower level of the home, and the men forced him at gunpoint to walk upstairs to the second level where a friend and child were located. The men forced R.H. and the friend to strip down to their underwear and demanded money and drugs. Toting guns, the men searched the home, and then forced R.H. and his friend to walk to the basement and lie on the floor. Smith, Woods, Stone, and Robinson then left the home, stealing marijuana, money, and Christmas gifts.

8. Pulaski Avenue (Counts Twenty and Twenty-One)

Bowens and Bellamy testified that on the morning of January 27, 2014, Smith, Woods, Jackson, Bowens, and Bellamy met at J.B.'s house on Pulaski Avenue in Philadelphia. According to Bowens, he and Smith entered the home through an upstairs window and then unlocked the front door for Woods to enter. The three men scoured the house for items to steal. Meanwhile, Jackson and Bellamy remained outside as lookouts. Sometime thereafter, J.B. and his girlfriend J.P. arrived at home, where J.B. was confronted by one male pointing a gun and demanding money. J.B. was assaulted, handcuffed, and forced to the floor while two other men searched through his home holding a hammer and a second firearm. All three men wore masks and gloves. Bowens testified that the men stole cocaine, approximately $10,000.00, and other items of value, stuffed those items into a red Puma bag, and then fled.

9. Mayfair Street (Counts Twenty-Two and Twenty-Three)

Bowens and Bellamy testified that on March 19, 2014, Smith, Woods, Munden, Hartley, Chaney, Jackson, Bowens, and Bellamy met near victim O.T.'s home on Mayfair Street in Philadelphia with plans to rob and kidnap O.T. Woods and Chaney waited in a parked van in front of O.T.'s house while the others waited nearby for O.T. When they observed O.T. arrive, Smith, Munden, Hartley, Chaney, and Bowens exited their vehicles and rushed and subdued O.T. Woods, Jackson, and Bellamy served as lookouts. Video footage showed five men attacking O.T. Bowens identified Smith, Munden, Hartley, Chaney, and Bowens as those five men.

Bowens testified that Smith, Munden, Hartley, Chaney, and Bowens presented themselves to O.T. as police officers, and then assaulted and subdued him before throwing him into Woods's van. O.T. was transported to Hartley's van and eventually Munden's garage, while being continuously assaulted. Once in Munden's garage, the men violently beat and tortured

O.T., demanding to know where he stored drugs and drug proceeds. Jackson remained behind at O.T.'s house to monitor for police activity.

Bowens and O.T. testified that when O.T. would not tell the men where his drugs or drug proceeds were, the men forced O.T. to call his sister J.T. to arrange for a ransom payment of $50,000.00. J.T. testified about this phone call. Once the ransom money was collected, O.T. was released.

### 10. Regent Street (Counts Twenty-Four, Twenty-Five, and Twenty-Six)

Bowens and Bellamy testified that on April 16, 2014, Smith, Woods, Munden, Hartley, Chaney, Bowens, Bellamy, and McFarland went to A.C.'s home on Regent Street in Philadelphia with the intention of robbing him. Smith, Munden, Bowens, and McFarland entered the home around 1:15 a.m. through a window in the dining room. Bellamy and Hartley remained outside as lookouts. Bowens explained that once inside, the men confronted A.C.'s wife I.C., who was downstairs getting water. Bowens and I.C. testified that I.C. was bound at her wrists and ankles by shoestrings before Woods was let in through the front door carrying a shotgun. Munden remained downstairs with I.C., covering her mouth with his hand and pointing a gun at her, as Smith, Woods, Bowens, and McFarland proceeded upstairs. I.C. later identified Munden as the man who held her downstairs.

According to Bowens, once upstairs, the men confronted A.C. who had woken from sleep at the sound of commotion downstairs. They assaulted A.C., handcuffed him, bound his ankles, and began demanding to know where drugs and drug proceeds were located. The men brutally assaulted and tortured A.C., punching him in the face, slamming his head against a wall, waterboarding him, and pouring boiling water on his upper leg and groin area. They also repeatedly threatened to sodomize A.C. and I.C., who was six months pregnant and at one point

forced to strip naked and get on her hands and knees as the men prodded her with a broomstick and threatened to force her to perform oral sex on one of them.

Eventually the men concluded they had the wrong house, mistakenly thinking A.C. was involved in drug dealing. Before leaving, the men stole jewelry and an iPad. Bowens took the keys to the family's Toyota Camry and the vehicle.

11. Ridge Avenue (Counts Twenty-Seven and Twenty-Eight)

Bowens and Bellamy testified that on April 24, 2014, Smith, Woods, Munden, Hartley, Bowens, and Bellamy met at victim O.W.'s house on Ridge Avenue in Philadelphia to rob him. Smith and Bowens initially went inside of the house and stole money and other items of value. Woods, Munden, Hartley, and Bellamy remained outside.

According to Bowens, Smith instructed him to leave the house with the stolen items and drive his car back to Lenox Street. Bowens did so, and in his absence, Hartley and Munden joined Smith inside of the home because O.W. had arrived home. Bowens later learned that the men confronted O.W. with guns, tying him at the wrists and ankles using electrical cords, and demanding to know where he kept his drugs and drug proceeds. O.W. also testified that multiple men confronted him with firearms and tied him at his wrists and ankles using a cell phone cord. O.W. directed the men to an alarm box, from which they stole money. They also stole designer shoes, bags, and belts, as well as more money from other areas of the home. Smith, Munden, and Hartley then left the house and all of the men fled the scene.

12. Wyndale Avenue (Counts Twenty-Nine and Thirty)

Bowens testified that on April 24, 2014, Smith and he entered the home of victim L.T. and stole money, jewelry, designer bags, and electronics when L.T. was not home. Believing they had missed drugs and drug proceeds, the men planned to return to L.T.'s home. On the

evening of April 29, 2014, Smith, Woods, Munden, Bellamy, and McFarland returned to Wyndale Avenue to commit an armed home invasion.

Bellamy and Bowens testified that they later learned the details of what occurred inside from Smith and Munden. They testified that Smith, Munden, and McFarland broke into L.T.'s home and waited for him to arrive, while Woods and Bellamy remained outside serving as lookouts. Bellamy alerted Woods when L.T. arrived home, and Woods then notified the men inside. When L.T. and his fiancé S.L. entered the home, they were confronted at gunpoint by Smith, Munden, and McFarland. L.T. and S.L. were subdued, however, L.T. struggled for a gun and was shot in the leg. L.T. wrestled the gun away from Smith and shot Smith in the buttocks as Smith fled through a window. L.T. then shot Munden in the arm, and Munden fled through a window. Finally, L.T. fatally shot McFarland. Woods and Bellamy also left the scene.

Woods and Smith were arrested by the Philadelphia Police Department following this incident. After fleeing Wyndale Avenue, the two had staged a shooting on Chew Avenue in an attempt to create a scenario where they could call 9-1-1 for Smith, who was bleeding from the wound incurred at Wyndale Avenue. Following the staged shooting, Woods dropped Smith off on a nearby street before leaving in a white van. Smith called 9-1-1 claiming he had been shot and was taken to Einstein Hospital. Police officers in the area heard radio calls regarding the Wyndale Avenue shooting, the staged shooting on Chew Avenue, and Smith's 9-1-1 call, and eventually pulled Woods over in the white van. As detailed below, the white van contained substantial physical evidence tying many of the Defendants to the crimes at issue.

### B. Specific Evidence Presented at Trial

The evidence presented by the Government was overwhelming. Six cooperating witnesses—Bowens, Bellamy, Queen, Scott, Hayes, and Miller—provided extensive details

regarding the events charged in the superseding indictment and pinpointed each Defendant's involvement. The Government provided substantial corroborating evidence for the testimony of each of these cooperators. Testimony from victims was presented for each incident, as was testimony from police officers who responded to the scenes of the incidents. Additionally, the ATF agents assigned to this case provided testimony regarding the overall investigation.

Physical evidence tying these Defendants to the various incidents was also introduced. After Woods was arrested on April 29, 2014, the police obtained search warrants for his cell phone and the white van he was driving when arrested. A search of Woods's cell phone revealed receipt of text messages from two GPS tracking devices. Cooperating witnesses explained that the white van was used by the Defendants for surveillance and to commit robberies. An initial search of the van revealed walkie talkies, handcuffs, ski masks, gloves, blood stains, keys, cell phones, and jewelry. Subsequent DNA analysis confirmed the blood stains in the van matched Smith's blood, DNA on several of the masks in the van matched that of Smith and Woods, and a fingerprint in the van belonged to Jackson. Two subsequent searches of the van uncovered a gun that matched the cartridge casings recovered from the staged shooting on Chew Avenue, a ladder, a pry bar, a screw driver, and multiple items of clothing. Additionally, blood inside of Wyndale Avenue contained DNA matching that of Munden.

After the incident on Wyndale Avenue, Smith's Cadillac was found two blocks from the residence where the home invasion transpired. A search of that vehicle revealed a receipt, bearing Smith's phone number, for the wipe and install of an Apple computer from an electronics store. ATF agents retrieved the computer, which they determined belonged to L.T.'s girlfriend (L.T. was the victim in the Wyndale Avenue incident). The search of Smith's car also uncovered gloves, masks, and a lease to Smith's apartment at the Towers at Wyncote, as well as

a bag belonging to the deceased McFarland, containing his wallet, identification, cell phone, money, two of Smith's cell phones, and a key fob to enter the Towers at Wyncote.

On May 6, 2014, Woods's car was located in a storage lot in North Philadelphia. A search of that car revealed two cell phones and a tool used for breaking into things. Woods was arrested on May 13, 2015 by Abington Township Police. The police seized and searched the vehicle Woods was driving at the time, finding three walkie talkies, a financial responsibility card in Jackson's name for a white Pontiac, a screwdriver, and a pry bar. ATF subsequently searched the home of Woods's mother and found a bag containing a GPS tracker and black skull cap. This tracker was the same brand of tracker from which Woods was receiving alerts on the recovered cell phones.

On May 12, 2015, ATF agents arrested Munden at his house. After searching the entirety of the home, agents found Munden hiding on the first floor behind a dryer. Munden consented to the search of the home and his vehicle after he was arrested, where agents found a telescoping ladder, zip-ties, a backpack containing medical supplies, a bolt cutter, two pry bars, a screwdriver, dark colored skull caps, a digital scale, binoculars, a scraping tool, and a Comcast bill in Munden's name bearing the address where G.T. and O.T. were held captive. Munden later made various statements to the agents, including "I know the difference between right and wrong"; "I'm built to do life"; and "I was going to try to escape through the [sunlight] in the bathroom . . . I'm tired right now, so I didn't really try to escape, but I will in prison."

On May 14, 2015, ATF agents arrested Jackson and conducted searches on two homes and Jackson's car. Agents found Jackson's cell phone, a police scanner, binoculars, a holster, and a Philadelphia Police patch.

On May 22, 2014, ATF agents executed a search warrant at Smith's apartment located in the Towers at Wyncote.  There the agents found a large sum of cash hidden in the closet, two firearm magazines that matched the make and model of a firearm recovered from Wyndale Avenue, black hats, prison letters, a key fob to a Cadillac, various notes and receipts, a designer bag later identified as stolen from Wyndale Avenue, and various other electronics.

Additional physical evidence provided by Bowens, Queen, and Bellamy to law enforcement was presented to the jury, including firearms, ammunition, masks, holsters, cell phones, police scanners, bolt cutters, pry bars, police patches, ballistic vests, boots, and gloves.

Lenox Street was described as the home base for members of the conspiracy.  Thousands of hours of footage from a poll camera installed on Lenox Street depicted Defendants and other members of the conspiracy meeting before and after many of the robberies.  Cooperators testified that Smith grew up on that block and Bowens's ex-girlfriend lived there.  Cooperating witnesses identified members of the group gathering on Lenox Street, both before and after many of the incidents described above, as well as their cars driving or parked on the block.  Footage also showed various members of the conspiracy carrying items identified as stolen during robberies.  For example, pole camera footage showed Smith, Bowens, Woods, Bellamy, and Jackson on Lenox Street after the Pulaski Avenue robbery.  The men are seen carrying the red Puma bag taken from the Pulaski incident into a home and Woods is later seen carrying that same bag out of the house and to his car.  That same footage shows Bowens taking a ladder he testified they had intended to use that day from the backseat of Bellamy's car.

The Government also presented compelling cell site evidence, which methodically linked the Defendants to the locations where crimes occurred.  ATF Agent Mark Sonnendecker, an expert in cell site location information, testified to the location of Defendants' cell phones in

relationship to cell sites near the various crime scenes. Agent Sonnendecker's testimony placed certain Defendants within .75 miles of cell sites that were in close proximity to the location of an incident at the time of the incident. For example, cell site location information established that Smith and Jefferson's cell phones were in the area of Railroad Avenue before and during the home invasion. Specifically, Smith and Jefferson's phones accessed a cell site that was .84 miles from the location of the Railroad Avenue incident. This type of testimony was presented for most of the charged incidents.

Finally, the Government presented telephone records detailing the call history between each Defendant before, during, and after robberies. For example, records show telephone calls between Scott and Jefferson, and Jefferson and Smith, on the evening prior to the Railroad Avenue robbery and in the early morning hours before the robbery.

## III.  MOTION FOR MISTRIAL

Over the course of the eleven-week trial, Defendants moved for a mistrial three times, all premised on the belated disclosure of <u>Brady</u> material. I denied the first two motions but held the third under advisement. Defendants contend that the following late disclosures amount to a cumulative <u>Brady</u> violation warranting a new trial:

- Bellamy informed the Government during a pretrial meeting that he had made two mistakes in previous testimony before the Grand Jury;

- The federal Government adopted Bellamy's unrelated state case, which resulted in a guilty plea;

- Detective Christopher Marano was present for a meeting with the state court judge and prosecutor regarding the withdrawal of Bellamy's conviction and sentence in the state court case;

- Bellamy entered a plea pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) in the adopted case before the Honorable John R. Padova;

- G.T. and S.P., both Government witnesses, were subjects of an ongoing FBI investigation;

- Bellamy received approximately $3,300.00 in subsistence payments from ATF while acting as a confidential informant; and

- Scott received approximately $1,000.00 in subsistence payments from ATF while acting as a confidential informant.

I will refer to the first four disclosures noted above as "the Bellamy disclosures," the fifth disclosure as "the G.T. and S.P. disclosures," and the final two disclosures as "the cooperator subsistence disclosures."

Before examining each of the alleged <u>Brady</u> violations, it is important to state the context in which the evidence in this case was presented and the types of crimes that were planned and committed. Defendants robbed and victimized drug dealers. Consequently, many of the Government's witnesses were either drug dealers or associated with drug dealing activity. And the six cooperating witnesses presented by the Government were also criminals with extensive records.

The reality with this type of case is that a majority of the Government's evidence was presented through witnesses with checkered pasts, and whose discoverable misdeeds were not always readily apparent or immediately available to the Government. While the timing of certain disclosures was not optimal, all occurring mid-trial, in every instance, counsel for the Government acted diligently and any possible prejudice was cured. Importantly, despite certain defense counsel's accusations, I found at trial, and repeat here now, that none of the belated disclosures were intentional.

## A. ***<u>Brady</u>* Standard**

It is well established "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment."

Brady v. Maryland, 373 U.S. 83, 87 (1963). "Impeachment evidence . . . as well as exculpatory evidence falls within the Brady rule." United States v. Bagley, 473 U.S. 667, 675 (1985) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)). Prosecutors must disclose exculpatory and impeachment evidence even if the defendant does not request it. United States v. Agurs, 427 U.S. 97, 106-07 (1976).

"A valid Brady complaint contains three elements: (1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense." United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991) (citing Moore v. Illinois, 408 S. Ct. 786 (1972)). The Supreme Court of the United States has stated that "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." Id. (quoting Agurs, 427 U.S. at 105). The United States Court of Appeals for the Third Circuit has observed that a defendant is entitled to a new trial where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is [defined as] a probability sufficient to undermine confidence in the outcome." Id. (quoting Bagley, 473 U.S. at 682). This materiality inquiry "requires consideration of the totality of the circumstances, including possible effects of non-disclosure on the defense's trial preparation." Id. (citing Gov't of Virgin Islands v. Martinez, 780 F.2d 302, 206 (3d Cir. 1985)).

**B. The Bellamy Disclosures**

1. Background

On March 6, 2017, a few days before Bellamy was scheduled to testify, counsel for the Government emailed all defense counsel the following:

> I write to advise that in preparation for Jeffrey Bellamy's testimony, he advised
> me on February 24, 2017, that he made two errors in previously recounting events

to include the following: Bellamy incorrectly included "Money," Marcus Bowens, in the Wyndale Home Invasion because he remembered him being involved in the burglary days earlier and forgot that Money was not involved the night of the home invasion[;] and, Bellamy did not drive his truck to the Regent Street home invasion, but rather went in Khalil Smith's Escalade from Lenox Street.

(Gov. Resp. at 79.)

On March 7, 2017, the Government explained that in preparation for his trial testimony, Bellamy corrected these mistakes. Hartley's counsel requested that I instruct the jury under Third Circuit jury instruction 4.19 (Credibility of Witnesses - Witness Who Has Pleaded Guilty to Same or Related Offense, Accomplices, Immunized Witnesses, Cooperating Witnesses) before Bellamy's testimony. I declined to do so because it would "place undue emphasis on one witness," however, I advised counsel that I would allow defendants "tremendous latitude to cross-examine" Bellamy about his corrections. (N.T. 3/7/17 at 169.)

Also on March 7, 2017, I heard argument on a request made by Smith's counsel to play a video of Bellamy committing an unrelated robbery of a grocery store. I had previously granted Smith's motion to compel production of that video, which he sought pursuant to Federal Rule of Evidence 404(b)(2) in order to demonstrate Bellamy's "knowledge and ability to plan and conduct robberies." During argument, Government counsel explained that the grocery store robbery was originally charged by the Philadelphia District Attorney's Office in state court, and that Bellamy had already pled guilty and was sentenced by the state court judge when the District Attorney's Office withdrew the charges and the United States Attorney's Office adopted the case. It was explained that thereafter Bellamy pled guilty in federal court on February 8, 2015 before the Honorable John R. Padova pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) ("C Plea"). Government counsel advised that the vacated state court sentence had

been seven-and-a-half to fifteen years, whereas the recommended sentence pursuant to the C Plea in federal court was seven years.

Government counsel also stated that the United States Attorney's Office had worked with the District Attorney's Office to have Bellamy's case dismissed in state court and adopted federally. Government counsel acknowledged that these events were "unusual," but explained that there had been concerns about Bellamy's safety in state custody because of his cooperation in a previous case. In light of these disclosures, I directed the Government to produce a letter or memorandum detailing this information, which they did the same day. (Id. at 171-87, 92.)

All defense counsel protested that this was the first time they had learned about the involvement of the United States Attorney's Office in Bellamy's state court case. Smith's counsel orally moved for a mistrial, contending this disclosure constituted a Brady violation, which all Defendants joined. I held this motion under advisement. (Id. at 233-34, 262-63.)

The Government produced its letter on the morning of March 8, 2017, providing the following information:

- Bellamy was charged in state court on February 8, 2011 and released on bail in June of 2011. On May 29, 2014 ATF agents and ATF Task Force Officer Detective Christopher Marano met with Bellamy for the first time regarding their ongoing investigation into a home invasion robbery crew (i.e., the crew charged in the case before me). On that same date Bellamy agreed to cooperate with ATF and later did so while on bail for his state case.

- On November 12, 2014, Bellamy pled guilty in the Court of Common Pleas in Philadelphia through a negotiated plea and was subsequently sentenced on the same day to a term of seven-and-a-half to fifteen years by the Honorable Sean F. Kennedy.

- On November 18, 2014, Bellamy—represented by counsel who was appointed by this Court to represent him in the federal grand jury matter—filed a motion to permit him to withdraw his guilty plea with Judge Kennedy. Bellamy's federal counsel and Detective Christopher Marano met with Judge Kennedy and a supervisor from the District Attorney's Office to discuss security issues related to Bellamy's cooperation in a previous case and his ongoing anticipated federal cooperation.

- At that same meeting, Bellamy's federal counsel requested that the United States Attorney's Office adopt Bellamy's state robbery case if she could convince the District Attorney's office to withdraw the state court plea. Counsel also asked the Assistant District Attorney to request that his office join in her request to Judge Kennedy to permit Bellamy to withdraw his plea, which he did on the conditions that the United States Attorney's Office charge Bellamy by complaint on November 21, 2014, take Bellamy into custody on November 21, 2014, and that Bellamy would plead guilty in federal court and serve a term of seven years.[5]

- The United States Attorney's Office agreed to these conditions and the Philadelphia District Attorney's Office permitted Bellamy to withdraw his guilty plea. Bellamy was charged by federal complaint on November 21, 2014 and pled guilty before Judge Padova pursuant to Rule 11(c)(1)(C) on February 9, 2015.

- The Government had provided all defense counsel with Bellamy's criminal history in December 2016, which included "withdrawn" as the disposition of the grocery store robbery, as well as the federally adopted charges filed on November 21, 2014.

(3/7/17 Gov. Letter.)

On March 8, 2017, after reviewing the above letter, Smith's counsel argued that the Defendants were prejudiced by this late disclosure because it represented a huge benefit bestowed upon Bellamy by the federal Government. Smith's counsel urged that even if the prejudice of this late disclosure could be cured, a mistrial should nonetheless be granted as "deterrence" and as a "sanction" for what she claimed was a "willful and knowledgeable" Brady violation. (N.T. 3/8/17 at 35-36.)

That same morning I denied, without prejudice, Smith's request to play the video of the grocery store robbery for the jury, but reserved a decision about future admissibility. After hearing extensive argument from counsel on the motion for a mistrial, I also determined that Bellamy, who was to take the witness stand that day, could be cross-examined on all of the above events, and defense counsel would have "tremendous latitude" on all details regarding the federal adoption of his state court case. I reasoned that it was difficult at that time to determine

---

[5] Although the letter states that Bellamy would serve a term of seven years, pursuant to Federal Rule of Evidence 11(c)(3)-(4), a C Plea does not bind the sentencing court.

whether there would be prejudice to the defendants regarding the late disclosures without hearing the cross-examination. I also ordered the Government to produce any written communications between the United States Attorney's Office and the District Attorney's Office regarding Bellamy's state case. (Id. at 5, 38, 71-72.)

Bellamy's direct examination proceeded on March 8, 2017, and the next day, March 9, 2017, counsel for Smith, Hartley, and Munden, and Woods (proceeding *pro se*), comprehensively cross-examined Bellamy on all aspects pertaining to the federal adoption of his state robbery case. On the same date, I ruled that the video of the grocery store robbery was admissible under Federal Rule of Evidence 404(b) and Smith's counsel played it for the jury during her cross-examination of Bellamy. (N.T. 3/9/17 at 90-93.)

On March 13, 2017, after reviewing the Government letter detailing the chronology of events, as well as emails exchanged between the United States Attorney's Office and the District Attorney's Office that were produced on March 9, 2017, and after defense counsel had completed their thorough cross-examination of Bellamy, I denied Defendants' motion for a mistrial, finding there had been no Brady violation. In denying the motion, I concluded that although the disclosure was belated, it was not intentional. I also found that while the information regarding the state court case was inadvertently suppressed and favorable for purposes of impeachment, it had been disclosed prior to Bellamy's testimony and effectively used during cross-examination. Consequently, I concluded that when viewed in the context of the entire record, there was no reasonable probability that the belated production would affect the outcome of the case. I also told defense counsel that if they deemed it necessary, they could request more resources under the Criminal Justice Act to examine the situation surrounding

Bellamy's plea and make further requests to recall Bellamy for additional testimony. (N.T. 3/13/17 at 234-43.)

Although Bellamy was not recalled by defense counsel, Detective Marano was called as a witness by Smith and questioned about his involvement in the federal adoption of Bellamy's state court robbery case. Additionally, ATF Supervisory Special Agent Anthony Tropea was called by Smith and questioned about the federal adoption of Bellamy's state court robbery case. (N.T. 4/4/17 at 42-49, 85-105.)

2. <u>Analysis</u>

Regarding the Bellamy disclosures, the first two elements of <u>Brady</u> are met: the Government inadvertently withheld the information, which was favorable to the defense.[6] However, for several reasons I conclude that the information was not material because there is no reasonable probability that the result of the proceeding would have been different had the information been timely disclosed.

First, defense counsel extensively examined Bellamy on all matters belatedly disclosed. Indeed, Bellamy was subjected to a full day of cross-examination on March 9, 2017. Defense counsel clearly highlighted for the jury that this was not Bellamy's first time cooperating with the Government, repeatedly making the point that Bellamy was a seasoned criminal and knew how cooperation could benefit him. All but Jackson's counsel seized the opportunity to examine Bellamy regarding the late disclosures as well as a variety of other issues, including the following:

- Bellamy withheld information from and provided incorrect information to ATF in early meetings. For example, Bellamy did not initially tell the agents about the Ridge Avenue incident;

---

[6] Although the emails produced by the Government show that one of the prosecutors was aware of what occurred in state court, there is no evidence that she purposefully concealed that information.

- Bellamy lied to the Social Security Administration in order to receive benefits and committed multiple crimes for which he was never charged;

- Bellamy was selling drugs when he applied for Social Security benefits;

- Bellamy was previously federally indicted for fraud and entered a cooperation plea agreement in that case whereby he received a lesser sentence;

- Multiple discrepancies existed between Bellamy's Grand Jury testimony and testimony at trial;

- Bellamy originally told ATF and the Grand Jury that Bowens was present for the Wyndale home invasion, but later corrected his testimony in a preparation session with Government counsel;

- Bellamy first testified on direct that he had not pled guilty to the Mayfair Street incident but later testified that he had;

- Bellamy acknowledged that when his case was federally adopted he entered into a C Plea for a seven-year sentence, and was questioned about his understanding of a C Plea. Bellamy answered questions about the difference in the sentence to which he would have been subjected in state court versus that to which he hopes to receive through the C Plea in the federal case. He also acknowledged that he is yet to be sentenced in that case and responded "maybe" when asked if perhaps the reason his lawyer has requested multiple extensions in that case is because she intends to ask Judge Padova to run that seven-year sentence concurrent with the one Bellamy receives in this case;

- Bellamy committed the crimes in this case during a time period in which he was on bail for his state robbery case. At no point while cooperating with the federal Government in this case did the Government alert the state authorities that Bellamy was in violation of his bail terms;

- The video of the grocery store robbery was played and Bellamy is seen stealing lottery tickets from a cashier with the assistance of an armed accomplice;

- Bellamy admitted that his testimony regarding Munden's presence at Regent Street, Ridge Avenue, and Wyndale Avenue was based solely on what Bowens told him;

- Bellamy testified about the previous instances where he had cooperated with both state and federal authorities; and

- Bellamy testified about his plea agreement in this case, acknowledging that he was required to plead guilty to only two § 924(c) charges of the seven for which he was

> indicted, as well as the maximum and mandatory minimum sentences Bellamy faces (life and thirty-two years respectively).

(N.T. 3/9/17 at 48-50, 52-55, 58-66, 70-80, 86-95, 96-108, 113-14, 134-35, 147-48, 150-57, 184-89, 205-22.)  Undoubtedly Bellamy was a witness who presented a lot of credibility material for defense counsel to utilize.  As Hartley's counsel pointed out, Bellamy's criminal history report is twenty-four pages long.

Second, although not dispositive, defense counsel used the belatedly disclosed information effectively.  In United States v. Moreno, 727 F.3d 255 (3d Cir. 2013), the Third Circuit found there was no Brady violation where defense counsel had the opportunity to cross-examine a witness about the contents of two documents disclosed the night before trial began. Id. at 262.  The court observed that because counsel was able to use the documents, defendant suffered no prejudice.  Id.

Here, counsel similarly had the opportunity to make use of the belatedly disclosed information.  Defense counsel pointed out multiple times through cross-examination the unusual manner in which the state robbery was adopted in federal court, the difference in sentences in state court versus the C Plea Bellamy entered before Judge Padova, and the fact that Bellamy had not yet been sentenced in the federally adopted case before Judge Padova.  Counsel also asked Bellamy many times about his changed testimony regarding Bowens's presence at the Wyndale Avenue home invasion and in which car he drove to Regent Street.  Additionally, Detective Marano and Special Agent Tropea were called in the defense case and asked extensively about the withdrawal of Bellamy's sentence in state court.

Finally, as discussed above in Section II and below in my cumulative analysis, the Government presented significant corroboration for Bellamy's testimony and overwhelming

evidence of the Defendants' guilt through physical evidence, cell phone evidence, victim testimony, and law enforcement testimony.

### C. G.T. and S.P. Disclosures

1. <u>Background</u>

On March 23, 2017, supervisors within the United States Attorney's Office advised Government counsel of a possible threat to one of its witnesses who had testified. While assessing this threat, Government counsel learned for the first time that Government witnesses, previously referred to as G.T. and S.P., were the focus of an ongoing FBI narcotics investigation (this investigation had no connection to this case). Specifically, it was discovered that S.P. was the "subject" of the investigation and that information had been "developed" regarding G.T. as part of that investigation. Importantly, no charges had been brought against either G.T. or S.P. regarding this investigation. Government counsel obtained all documents from the FBI regarding G.T. and S.P. and immediately provided redacted copies to defense counsel on March 24, 2017.

G.T. and S.P. had both testified earlier at trial regarding the Master Street incident, explaining how they were targeted by members of the conspiracy in late October of 2013 because they were both dealing drugs at the time. G.T. testified that although he was involved with drug dealing in October of 2013, he was no longer selling drugs. When asked if he had stopped selling drugs when the Master Street incident occurred, he said "yes." (N.T. 2/16/17 at 183.) S.P. testified that he was dealing cocaine at the time of the Master Street incident, but that he had not been selling cocaine for long beforehand. Rather, he explained he had been selling cocaine for "less than a couple of months." S.P. later clarified that he had been convicted for

drug distribution in 2000, but that he "took a hiatus from 2000 to 2013 in selling drugs." (N.T. 2/21/17 at 14, 31, 53.)

On March 27, 2017, Government counsel detailed how they learned about the investigation into G.T. and S.P., explaining they received an email on the afternoon of March 23, 2017 regarding an open investigation into S.P. that also involved G.T. Government counsel also acknowledged that information pertaining to the investigation into G.T. may be inconsistent with G.T.'s previous testimony that he had stopped selling drugs after the Master Street incident, but stated that the information regarding S.P. did not necessarily contradict S.P.'s testimony. Government counsel reiterated that they had previously been unaware of the FBI investigation and that another prosecutor was assigned. (N.T. 3/27/17 P.M. at 30-35.)

Hartley's counsel moved for a mistrial, alleging that the disclosure of information about G.T. and S.P. constituted a <u>Brady</u> violation. He maintained that Government counsel had "constructive possession" of the G.T. and S.P. information, which had been suppressed, was material, and prejudicial to his client. Alternatively, Hartley's counsel asked that I dismiss the counts associated with the Master Street incident. (<u>Id.</u> at 39-45.)

Government counsel responded, explaining that ATF agents assigned to this case had followed internal procedures by running G.T. and S.P.'s names through a database called "Case Explorer" to determine if any other agency was investigating either witness.[7] Counsel represented that this search received no results.[8] (<u>Id.</u> at 48-50.)

_____

[7]     **Government Counsel:** "It's a system whereby if a federal agency is targeting an individual or group of individuals, they enter them into a computer database. So any time some other federal agency may be interested in or gets information and wants to open a case, they run the name through Case Explorer, and they determine whether or not some other federal agency is, in fact, already investigating them." (N.T. 3/27/17 P.M. at 49.)

[8]     It was further explained that unbeknownst to ATF at the time, the FBI believed S.P.'s name to be "Shawn Baker," thus the FBI investigation was unknowingly under a different name

To ensure that the newly discovered information regarding G.T. and S.P. was put before the jury, Government counsel offered to stipulate that G.T. and S.P. had testified they were no longer involved in drug trafficking but their names had appeared in an ongoing drug trafficking investigation. Defense counsel rejected this offer. (Id. at 51-52.)

On March 29, 2017, I determined that there had been no Brady violation because Government counsel did not have "constructive possession" of the information about G.T. and S.P. I concluded that the case before me was handled by ATF, a separate federal agency than the one handling the FBI drug investigation into G.T. and S.P., and there was no evidence that the agencies had shared information. I concluded that while Government counsel in this case worked in the same office as the prosecutor assigned to the G.T. and S.P. FBI case, they could not be held responsible for a central storage of all Brady information for all witnesses. I also concluded that there was no authority permitting me to attribute to Government counsel in this case the information known to the assigned prosecutor in the FBI investigation. However, in fairness to the Defendants, I ordered that G.T. and S.P. could be recalled and questioned regarding their alleged continued activity as drug dealers. (N.T. 3/29/17 at 10-13, 16.)

On April 5, 2017, G.T. was recalled for additional examination. Hartley's counsel asked G.T. about alleged illegal distribution of narcotics after the Master Street incident, which G.T. denied. G.T. also stated that he told the truth about his drug dealing activities when he previously testified. (N.T. 4/5/17 A.M. at 26-32.) S.P.'s attorney advised that his client would exercise his rights under the Fifth Amendment if recalled to be questioned about drug dealing activity, and thus S.P. was not recalled.

in the system. Additionally, although in the "moniker section" of the database (explained as an "alias section") S.P.'s correct name was listed, it was spelled incorrectly. ATF, however, knew S.P.'s real name and entered that name in the database. Because only "Shawn Baker" and the misspelling of S.P.'s name were in the database, ATF's search received no results. (Id. at 49-50.)

2. <u>Analysis</u>

Defendants contend the Government had constructive knowledge of the FBI narcotics investigation. The Third Circuit has observed that "[t]here is no question that the government's duty to disclose under <u>Brady</u> reaches beyond evidence in the prosecutor's actual possession." <u>United States v. Risha</u>, 445 F.3d 298, 303 (3d Cir. 2006). Prosecutors do have a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." <u>Id.</u> (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995)). When a prosecutor does not have actual knowledge but should have, the prosecutor is deemed to have "constructive possession." <u>Id.</u> at 303. The Third Circuit has described constructive possession as when "although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence. Accordingly, we consider *whether the prosecutor knew or should have known of the materials* even though they were developed in another case." <u>Id.</u> (citing <u>United States v. Joseph</u>, 996 F.2d 36, 39 (3d Cir. 1993)) (emphasis in <u>Risha</u>).

In order to determine whether a prosecutor constructively possessed information, the court must consider three factors: (1) "whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'"; (2) "the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources"; and (3) "whether the entity charged with constructive possession has 'ready access' to the evidence." <u>Id.</u> at 304.

In analyzing the second factor of the <u>Risha</u> test, the Third Circuit looks at whether the prosecution and the party with knowledge of the information were participating in a joint investigation or sharing resources. <u>Id.</u> "[A] federal prosecutor is charged with knowledge of information possessed by other agents of the federal government when those agents are a part of

a 'prosecution team,' which includes federal personnel involved in the investigation as well as the prosecution of a case." United States v. Reyeros, 537 F.3d 270, 281 (3d Cir. 2008) (citing United States v. Pelullo, 399 F.3d 197, 216-18 (3d Cir. 2005)); see also United States v. Antone, 603 F.2d 566, 569 (5th Cir. 1979) ("[T]his Court has declined to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel.")).

For example, in United States v. Pelullo, 399 F.3d 197 (3d Cir. 2005), the Third Circuit held that the prosecution did not constructively possess information held by the Pension and Welfare Benefits Administration ("PWBA"), the civil branch of the Department of Labor ("DOL"). In Pelullo, DOL agents participated in the prosecution's investigation of defendants for embezzlement and money laundering, and while the court recognized that those agents participated in the investigation, it explained that such participation "does not mean that the entire DOL is properly considered part of the prosecution team." Id. at 218. The Third Circuit found that PWBA was not part of the prosecution team because PWBA was not "engaged in a joint investigation or otherwise shared labor and resources." Id.

In United States v. Locascio, 6 F.3d 924 (2d Cir. 1993), the FBI was the investigating agency in both the case at trial and an open investigation into one of the government's trial witnesses. Id. at 949-50. The United States Court of Appeals for the Second Circuit held that the prosecution did not constructively possess impeachment evidence concerning the government witness found in a report prepared by FBI agents working on the open investigation. Id. The Third Circuit has twice cited to this case with approval. See Pelullo, 399 F.3d at 216; United States v. Merlino, 349 F.3d 144, 154 (3d Cir. 2003).

In contrast, in <u>United States v. Antone</u>, 603 F.2d 566 (5th Cir. 1979), the United States Court of Appeals for the Fifth Circuit held that the prosecution constructively possessed information possessed by state investigative agents because the prosecutors and state agents had "cooperated intimately from the outset of [the] investigation" and the degree of cooperation was "extensive." <u>Id.</u> at 569. The Fifth Circuit observed that the state investigative agents "functioned as agents of the federal government under the principles of agency law" and "were in a real sense members of the prosecutorial team." <u>Id.</u> at 570.

Here, the main law enforcement investigative agency was ATF. In preparation for trial, ATF followed internal procedures and ran the names they had for G.T. and S.P. through Case Explorer. Their search received no results for S.P. because the FBI had him listed under an inaccurate primary name and a misspelled alias name. Although not explicitly explained by the Government, because G.T. was not a subject or target of an investigation, but rather a peripheral figure implicated in the investigation into S.P., his name also did not come up in the search. It was only on March 23, 2017, in an email from an FBI agent, that Government counsel in this case learned of the FBI's open investigation into S.P. Unlike the prosecutors and state investigative agents in <u>Antone</u>, Government counsel here had no interaction with the FBI drug case. There is no evidence of a joint investigation into S.P. or G.T. To conclude that the FBI and Government counsel in this case were part of the same prosecution team like in <u>Antone</u> would be an inappropriate expansion of Third Circuit precedent.

That there was another prosecutor within the same office assigned to the FBI's investigation of S.P. does not alter my conclusions. Case law in this circuit does not dictate that where one prosecutor is assigned to an FBI investigation, knowledge associated with that investigation is imported to every other prosecutor in that office. Rather, courts have found that

where one prosecutor possesses knowledge of <u>Brady</u> information, a subsequent prosecutor <u>on the same case</u> has constructive possession of that information. See, e.g., <u>United v. Galvis-Valderamma</u>, 841 F. Supp. 600, 608 (D.N.J. 1994) (finding that the second prosecutor on the case had constructive knowledge of report where the initial prosecutor knew about the report). There is no such overlap in prosecutors in this case.

I conclude that Government counsel in the case before me did not constructively possess either the information regarding the FBI investigation into S.P. or the information regarding G.T. born from that investigation. Because Government counsel did not constructively possess the information, the <u>Brady</u> material was not suppressed and no <u>Brady</u> violation occurred.

### D. The Cooperator Subsistence Disclosures

1. <u>Background</u>

While ATF Agent Charles Doerrer was testifying about ATF's policies for confidential informants on March 30, 2017, Government counsel learned for the first time that ATF had possibly paid cooperators Bellamy and Scott for expenses incurred during the course of their cooperation. Hartley's counsel asked Agent Doerrer about ATF's policies and then asked whether Bellamy was a paid informant, which the agent said was "possible." At sidebar, Government counsel stated that he was unaware of any payments to Bellamy. Hartley's counsel requested any evidence of payments made to Bellamy.

On April 2, 2017, Government counsel produced information regarding subsistence payments to both Bellamy and Scott, showing that Bellamy received approximately $3,300.00, and Scott approximately $1,000.00. Defense counsel again moved for a mistrial, arguing the late disclosure of the payments constituted a <u>Brady</u> violation. Defense counsel also urged that a

cumulative <u>Brady</u> violation had occurred in light of all of the late disclosures. This Motion was under advisement and is discussed <u>infra</u>. (N.T. 4/3/17 A.M. at 5.)

On April 4, 2017, the Government produced ATF policies pertaining to confidential informants. Bellamy was recalled on April 4, 2017 and questioned about the payments, which he admitted receiving. Scott was also recalled that day and questioned about the payments, which he acknowledged receiving. Detective Marano and Agent Doerrer were also called by Smith's counsel in the defense case and testified about the subsistence payments to Bellamy and Scott. (N.T. 4/4/17 at 33-35, 37-41, 60-72, 74-75; N.T. 4/5/17 A.M. at 44-46, 52-54.)

All witnesses and evidence regarding the subsistence payments were fully considered by the jury, curing any prejudice to Defendants. In fact, it is likely that recalling witnesses allowed defense counsel to shine a brighter light on the subsistence payments. In light of defense counsel's thorough use of the payment disclosures and the overwhelming evidence submitted in this case, I conclude that the disclosures pertaining to Bellamy and Scott were not material because there is not a reasonable probability that the result of the proceeding would have been different had the information been timely disclosed.[9]

---

[9]     Additionally, like Bellamy, defense counsel thoroughly examined Scott on all credibility issues, including that he had set his girlfriend and her mother up to be robbed; that he later told Bowens money had been missed at the house on Railroad Avenue and that he would tell him where to find it; that he lied to the detectives who responded to the Railroad Avenue incident and told them he was a victim of the robbery; that he had prior convictions as both a juvenile and an adult; that he committed the crimes to which he pled guilty in this case while on parole; that initially when he began cooperating with ATF, he provided inaccurate information to the agents; that he had failed to correct the Government during his direct examination on the identification of certain speakers when listening to and discussing a telephone call between Bowens and Jefferson; and that he was hoping for a downward departure motion from the Government at sentencing. (N.T. 2/14/17 at 42, 45-47, 54-55, 59-60, 76-87, 91.)

### E. Cumulative Analysis

Defendants further request that I analyze the Bellamy disclosures, the G.T. and S.P. disclosures, and the cooperator subsistence disclosures together. They urge that all belated discovery disclosures, when viewed together, resulted in a cumulative <u>Brady</u> violation warranting a new trial.[10]

As discussed in detail in Section II of this Opinion, significant evidence was presented at trial to support the jury's verdict. It is worth recounting some of that evidence here: six cooperating witnesses who provided detailed accounts of the incidents; testimony from victim witnesses for each incident; physical evidence, which included numerous items used for robberies retrieved from the white van in which Woods was pulled over, Smith's Escalade and apartment, Woods's vehicle, Munden's vehicle, and Jackson's vehicle; DNA evidence confirming blood stains in the white van matching Smith's blood, as well as DNA from blood inside of the house on Wyndale Avenue matching Munden; DNA on several of the masks in the van matching that of Smith and Woods, and a fingerprint in the van belonging to Jackson; thousands of hours of pole camera footage showing members of the conspiracy meeting on Lenox Street meeting before and after robberies; and evidence tying the location of the Defendants' cell phones on the date of many of the incidents to cell sites near crime scene locations.

Despite this mountain of evidence, Smith's counsel contends that the trial was unfair because she did not have use of the belatedly disclosed materials prior to trial. Smith's counsel

---

[10]  In addition to the brief submitted by Smith pressing a cumulative <u>Brady</u> violation, Hartley submitted a brief in support of the Motion for Mistrial, attaching a motion and memorandum filed in a separate case presided over by the Honorable Timothy J. Savage. (Dkt. No. 15-024-1.) That case has since been reassigned to my docket for sentencing. But because Docket Number 15-024-1 was a separate trial involving completely separate facts and discovery violation allegations, I will not consider this Motion.

notes that the Third Circuit has said that courts must look at whether suppression caused the defendant to "abandon lines of independent investigation, defenses, or trial strategies that [he] otherwise would have pursued." Maynard v. Gov't of Virgin Islands, 392 F. App'x 105, 115 (3d Cir. 2010). She points out that the first violation was discovered after openings and after sixty witnesses had already testified.

But Smith's counsel has not identified what lines of investigation, defenses, or trial strategies she was unable to pursue nor has she explained how her opening or witness examinations would have differed. ("Mr. Smith's defense presentation would have been different if the Brady materials had been disclosed pretrial." Mot., Doc. No. 772, at 12.) And it is difficult to imagine how Smith's counsel's strategy, or that of any other defense counsel, would have changed had they known about Bellamy's state case, the change in Bellamy's testimony as to Bowens being at Wyndale and what car he drove in to Regent Street, and the subsistence payments to Bellamy and Scott. As exhaustively detailed above, four very skilled and experienced defense attorneys, armed with ample material to discredit, thoroughly and relentlessly examined both of these witnesses.

Although the belatedly disclosed material was effectively used, Smith presses that Simmons v. Beard, 590 F.3d 223 (3d Cir. 2009), entitles him to a new trial. In Beard, the Third Circuit granted habeas relief in a death penalty case where multiple pieces of exculpatory evidence were withheld. Those pieces of evidence included: that the defendant's girlfriend had been pressured into agreeing to electronic surveillance of conversations with the defendant; that a key witness had made misrepresentations about her criminal history in trying to purchase a firearm and that the prosecution had helped her avoid liability for those misrepresentations; that lab results were inconclusive as to forensic evidence found on the nightgown of an assault

victim; and that the same victim was unable to identify the defendant from a mug book.  Id. at 228-29.  Importantly, none of this information was disclosed during trial.  Concluding that the late disclosure of these pieces of evidence amounted to a cumulative Brady violation, the court explained that "the picture of what Simmons's trial would have been like had these four Brady violations not occurred is vastly different from what actually happened" because "[t]he two key witnesses . . . would have been substantially less credible, thus undermining the main evidence implicating Simmons."  Id. at 238.

Here, all of the information regarding the federal adoption of Bellamy's state case and the subsistence payments to Bellamy and Scott was disclosed during trial and thoroughly set out for the jury.  Unlike in Simmons, we know what the trial would have looked like had this information been disclosed earlier because counsel had the opportunity to make use of the material during trial.

I thus conclude there was no cumulative Brady violation, and the Motion for Mistrial is denied.[11]

---

[11]     In his Rule 33 Motion, Smith points to a list of cases where mistrials were granted when Brady material was turned over mid-trial.  I find these cases to be factually inapposite.

First, although the court in United States v. Embry, No. 10-cr-0056, 2010 WL 5387490 (N.D. Okla. Dec. 22, 2016) previously granted mistrials in the case, the issue in the opinion cited to by Smith was whether Brady material turned over after trial warranted a new trial.

Second, in United States v. Archibald, No. 02-cr-335, 2003 WL 561096 (E.D. Pa. Feb. 26, 2003), the court addressed a motion to bar retrial pursuant to the Double Jeopardy Clause.  In addressing this motion, the court noted that it had previously granted a motion for mistrial where it found that the government had (1) elicited testimony it had reason to believe was incorrect based on documents it produced (and belatedly disclosed to defendant), and (2) "repeatedly demonstrated a failure to turn over evidence."  Id. at *3.  There, the location of the defendant's residence was a significant issue at trial, and the documents belatedly turned over by the government contained information as to that exact issue.  No such central issue was raised in the materials belatedly disclosed late here.

## IV.  THE RULE 29 MOTIONS

On March 30, 2017, at the close of the Government's case, all Defendants made an oral

Motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure Rule 29(a).

Smith and Jackson also each filed written Motions pursuant to Rule 29(a) at the close of the

---

Third, in United States v. Washington, 294 F. Supp. 2d 246 (D. Conn. 2003), the court granted a new trial pursuant to Rule 33 in light of a mid-trial disclosure of evidence pertaining to the key witness's prior conviction for making a false police report and prosecutorial misconduct in examining that witness.  Id. at 251.  The court noted that the trial had been short and the evidence weak.  Here, the first Bellamy disclosures came weeks into trial and the evidence of guilt presented was substantial.

Fourth, in United States v. Alvin, 30 F. Supp. 3d 323 (E.D. Pa. 2014), the court dismissed the indictment as a sanction where the government had suppressed forensic evidence for four years and produced it five days before trial.  Id. at 351.  The court observed the difference between this type of evidence, which could be used for pretrial investigation, and evidence that is used to assist in cross-examination, concluding that the forensic evidence could have generated other evidence useful to defense strategy.  No forensic evidence was suppressed here, nor was such critical evidence withheld for years.

Fifth, United States v. Garner, 31 F. Supp. 3d 856 (N.D. Miss. 2014) has since been reversed and remanded by the Fifth Circuit, but also concerned a situation where the government did not unseal the indictment until trial began and thus the defendants were unaware which of the twenty-six charges implicated the government's key cooperating witness.  The facts of that case are entirely unlike those before me.

Sixth, in United States v. Woodley, No. 15-cr-143, 2016 WL 3906648 (E.D. Tenn. Aug. 10, 2016), the court granted a new trial where the government disclosed audio and video recordings from three police body cameras, one of which identified a witness who had been previously unknown to the defense, on the eve of trial.  Id. at *1.  The government did not locate the witness until after trial and he did not testify.  Id.  In granting a new trial, the court observed that "[t]he prosecution's suppression of the body camera evidence deprived the defendant of what is apparently the only witness able to even partially corroborate his version of the shooting."  Id. at *3.  No such suppression of evidence occurred here where the impeachment material was disclosed during trial and Defendants were able to ask the relevant witnesses about the material in front of the jury.

Finally, in United States v. McCallum, 885 F. Supp. 2d 105 (D.D.C. 2012), the court declared a mistrial where one of the prosecutors failed to produce recordings of an officer's statements to internal affairs after he arrested the defendant.  The opinion cited to by Smith pertains to the retrial, however, and therefore sheds no light on the court's analysis in declaring the mistrial.

Government's case. As Rule 29(b) permits, I reserved decision on these Motions. After the verdict, Smith, Woods, Hartley, and Jackson all filed Motions for judgment of acquittal pursuant to Rule 29(c).[12] Subsequently Woods also joined in Smith, Hartley and Jackson's Motions; Munden joined in Smith, Hartley, and Jackson's Motions; and Jackson joined in Hartley's Motion.

All Defendants challenge their conviction on Count One, contending that an impermissible variance exists between the single conspiracy charged in the superseding indictment and the evidence at trial. Jackson, Woods, Munden, and Hartley further allege that the Government presented insufficient evidence that they joined any conspiracy, let alone the one charged in Count One.

Smith, Woods, and Munden also contest their conviction under Count Sixteen, arguing that the Government presented insufficient evidence to establish the elements of carjacking. Smith, Woods, Munden, and Hartley press the same argument regarding Count Twenty-Five. Through Smith's supplemental submission, without any explanation, Smith, Woods, and Munden also assert that the Government presented insufficient evidence as to Counts Two, Three, Six, Seven, Eight, Nine, Fifteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Four, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, and Thirty.

---

[12] Woods has also filed a Motion pursuant to Rule 34, which raises the same arguments contained in his Rule 29 Motion. As such, I will address his arguments below in Section VI.

Finally, Jackson, Woods, and Munden argue that the Government presented insufficient evidence to demonstrate that they used or carried a firearm during an act of violence, or aided or abetted such use, as charged in Count Twenty-One.[13]

## A. Legal Standard

Federal Rule of Criminal Procedure 29(a) permits a defendant to move for a judgment of acquittal "after the government closes its evidence or after the close of all the evidence . . . for [any offense] which the evidence is insufficient to sustain a conviction."  Rule 29(b) allows the court to "reserve decision on the [Rule 29(a)] motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict."  However, "[i]f the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b); see also United States v. Tyson, 653 F.3d 192, 199 (3d Cir. 2011).

Rule 29(c) permits a defendant to "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later. . . .  If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  A motion for a post-verdict judgment of acquittal requires the court to "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."  United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979).  The court must "draw all reasonable inferences in favor of the jury verdict."  United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996).  "Courts must be ever vigilant in

---

[13]     Jackson's motion filed pursuant to Rule 29(a) also challenged the sufficiency of the evidence as to Counts Twenty-Three and Twenty-Six.  Jackson was acquitted of these counts.

the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).

A defendant bears an "extremely high" burden when challenging the sufficiency of the evidence supporting a jury verdict. United States v. Iglesias, 535 F.3d 150, 155 (3d Cir. 2008) (quoting United States v. Lore, 430 F.3d 190, 203-04 (3d Cir. 2005)). "Thus, a finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (quoting United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)).

**B. Sufficient Evidence Was Presented to Demonstrate that Defendants Were Guilty on Count One - Conspiracy**

1.  A Single Conspiracy Existed

The superseding indictment charges that a single conspiracy existed from September 2012 through April 29, 2014. The superseding indictment alleges that all Defendants (with the exception of Romel Anthony) conspired to commit robbery by unlawfully taking illegal controlled substances, and other controlled substances, the proceeds from the sale of controlled substances, jewelry, money, and other items of value. It is alleged that this illegal activity occurred in the presence of other people against their will, and by means of actual and threatened force, violence, and fear of injury. Eleven overt acts are outlined as incidents that furthered the conspiracy.

The jury found that this single conspiracy existed and that Smith, Woods, Munden, Hartley, and Jackson each participated in it. Defendants contend that the evidence presented established the existence of "various, distinct" conspiracies, not the single overarching conspiracy, and that this difference amounts to a prejudicial "fatal variance." Jackson, Woods,

Munden, and Hartley raise the additional argument that even if a single overarching conspiracy was established, the Government failed to present sufficient evidence that they were party to any agreement, let alone the single overarching conspiracy.

To establish a criminal conspiracy, the Government must prove "[1] a unity of purpose between the alleged conspirators, [2] an intent to achieve a common goal, and [3] an agreement to work together toward that goal." United States v. Riggs, 171 F. App'x 961, 964 (3d Cir. 2006). These elements may be proven through circumstantial evidence. Id.

A variance is present where a single conspiracy has been alleged in the indictment, however, the evidence shows multiple conspiracies. Id. To succeed on a claim of fatal variance, a defendant must show (1) there was a variance between the indictment and proof at trial, and (2) that variance prejudiced some substantial right of the defendant. Kotteakos v. United States, 328 U.S. 750 (1946). The substantial right at issue is "the right not to be tried en masse for the conglomeration of distinct and separate offenses committed by others." Id. at 775.

The Third Circuit instructs that courts analyzing whether evidence establishes that defendants engaged in a single conspiracy or multiple conspiracies must consider the following: (1) "whether there was a common goal among the conspirators"; (2) "whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators"; and (3) "the extent to which the participants overlap in the various dealings." United States v. Kelly, 892 F.2d 255, 259 (3d Cir. 1989) ("the Kelly factors").

Significantly, the Third Circuit has stated that "a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not create an impermissible variance." United States v. Smith, 789 F.2d 196, 200 (3d Cir. 1986);

see also Blumenthal v. United States, 332 U.S. 539, 558 (1947) (finding a variance where "[t]he conspiracies were distinct and disconnected, not parts of a larger general scheme"). Rather, the Government need only show that the conspirators making up the sub-schemes "actually all committed to the same set of objectives in a single conspiracy." Smith, 82 F.3d at 1271. The Government does not need to prove that "each defendant knew all of the conspiracy's details, goals, or other participants . . . . However, [it] must proffer sufficient evidence from which a jury could have concluded that each . . . [incident] in which [the defendant] was involved was 'a step in achieving the conspiracy's common goal[s].'" United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999) (quoting United States v. Theodoropoulos, 866 F.2d 587, 593 (3d Cir. 1989)).

Additionally, "[a] single conspiracy is not transformed into a series of unrelated, multiple conspiracies merely through a change in its membership." Kelly, 892 F.2d at 259. "Parties may join the conspiracy after its inception, and may withdraw and terminate their relationship with the conspiracy prior to its completion." United States v. Boyd, 595 F.2d 120, 123 (3d Cir. 1978) (citations omitted). A sporadic participant can be shown to be a member of a conspiracy where "evidence, direct or inferential, of knowledge shows that [he] was part of the larger operation." Gibbs, 190 F.3d at 198 (quoting United States v. Price, 13 F.3d 711, 728 (3d Cir. 1994)). Importantly, "even if a small group of co-conspirators [is] at the heart of an unlawful agreement, others who knowingly participate with the core members and others to achieve a common goal may be members of a single conspiracy." Id. (citing United States v. Varelli, 407 F.2d 735 (7th Cir. 1969)). Still, the Government must show that a defendant claiming a variance knew he was part of a larger operation. United States v. Quintero, 38 F.3d 1317, 1337 (3d Cir. 2004). "By acting in furtherance of the co-conspirators' goals with knowledge of the improper purpose, the

jury can reasonably infer that the new member has achieved a tacit agreement with members of the ongoing conspiracy." United States v. Klein, 515 F.2d 751, 753 (3d Cir. 1975).

Authority within this circuit is fairly extensive on the issue of conspiracy and variance. The Government cites to United States v. Jones, 126 F. App'x 560 (3d Cir. 2005), and United States v. Gosizk, No. 02-cr-772-07, 2005 WL 3110989 (E.D. Pa. Nov. 1, 2005), as examples of cases where courts found there to be a common scheme and thus no variance between the indictment and evidence presented at trial.

In Jones, Defendant William Jones challenged his conviction of conspiracy to commit Hobbs Act robbery. 126 F. App'x at 562. The evidence showed that Jones planned one robbery with co-conspirators Harris, Franklin, and Krug, providing guns to Harris and Franklin, and driving Franklin to the robbery. Id. Franklin was shot during the robbery, and while Harris and Krug drove him to the hospital, they called another co-conspirator named Miranda to inform him that they had completed the robbery. Id. Jones similarly called Miranda to inform him about the robbery, and also told another co-conspirator named Collins about the crime. Id. The evidence also showed that Jones planned a second robbery, meeting up with Harris and Miranda beforehand, supplying guns to Miranda and Collins, and driving Collins to the robbery. Id.

Applying the first Kelly factor, the court found that a reasonable jury could conclude that Jones, Harris, and Miranda had a common goal to rob jewelry stores based on the facts that Jones planned and participated in both robberies, Harris participated in both and asked Krug to help out with the first, and Miranda intended to participate in the first and did participate in the second. Id. at 564-65. Regarding the second Kelly factor, the court concluded that Jones contemplated bringing to pass the continuous result of robbing jewelry stores, and that Harris's participation in both robberies "suggested his agreement with Jones to do so." The court found that the same

was true of Miranda and Collins. <u>Id.</u> at 565. Finally, as to the third <u>Kelly</u> factor, the court determined that Jones and Harris's participation in both robberies "is sufficient to show that their dealings in both overlap." <u>Id.</u> The court concluded that all of the <u>Kelly</u> factors were met and there was no impermissible variance. <u>Id.</u>

In <u>Gosizk</u>, fifteen defendants were indicted, six went to trial, and four were found guilty of conspiracy to commit robbery and various other substantive charges. 2005 WL 3110989, at *1. Defendants Scott Gosizk, Harvey Waugh, and Charles Whitfield filed post-verdict motions challenging the sufficiency of the evidence as to the conspiracy charge, contending a variance existed. <u>Id.</u> The district court disagreed, finding that the evidence showed a "confederacy" of men committed "numerous" burglaries and armed robberies over the course of two years. <u>Id.</u> Defendants Christopher Plytas, Mark Daniels, and William Myrick were "central" to the scheme, with Plytas as the leader. <u>Id.</u> at *2. Other defendants went in and out of the conspiracy over the course of two years, playing different roles and receiving proceeds. <u>Id.</u> As the district court observed, "[s]uccess depended upon the coordination of the team members." <u>Id.</u>

Analyzing the <u>Kelly</u> factors, the court observed that each defendant was aware Plytas was the leader of the group, wanted money, and knew he could obtain money through participation in the robbery group. <u>Id.</u> Although no individual member knew the duration of the conspiracy or even all members of the group, each knew it existed to acquire money through burglaries and robberies. <u>Id.</u> While Gosizk and Whitfield each participated in only one burglary or robbery, the court found that each knew that the single incident in which he participated was "part of the overall conspiracy in which others played overlapping roles." <u>Id.</u> Gosizk was Plytas's nephew, and Plytas permitted Gosizk to participate in a robbery of a gas station. <u>Id.</u> at *3. Gosizk had been recently released from prison, was living in a motel without money, and sought

employment with his uncle. Id. Whitfield was recruited by Myrick to join the conspiracy and served as a driver and lookout for the burglary of a beer distributor. Id. Waugh sought membership in the conspiracy and joined Plytas and Daniels in robbing a night manager of a grocery store. Id. The district court concluded that based on these facts, there was sufficient evidence from which a juror could have concluded that there was a single conspiracy. Id.

Whitfield appealed, arguing that because he was only a lookout for a single burglary, there was insufficient evidence to convict him of the larger conspiracy. United States v. Whitfield, 215 F. App'x 190, 191 (3d Cir. 2007). The Third Circuit affirmed, observing that Myrick had testified that Whitfield knew how the group was getting money and Plytas testified that Whitfield was excited about being included in the group because "he [knew] he was going to be paid good." Id. at 191-92. The court observed that this evidence "supported a strong inference that Whitfield knew that his participation in the [single] burglary would contribute to a larger conspiracy that was providing a source of revenue to the group he willingly joined." Id. at 193.

Turning to the facts before me, I conclude that the Government presented sufficient evidence such that a rational juror could have found proof of guilt beyond a reasonable doubt that a single, overarching conspiracy existed. The evidence established that for approximately twenty months, Smith and Woods oversaw a criminal conspiracy that targeted drug dealers, assaulting and kidnapping them, and committing carjackings and kidnappings when necessary. Smith and Woods brought together teams from different parts of Philadelphia—the "West side" (Bowens, Queen, Bellamy, Jefferson, and McFarland) and the "East side" of Erie Avenue (Chaney, Munden, Hartley, and Jackson) to accomplish the goals of the conspiracy. Additional co-conspirators were recruited because they either had information regarding a particular drug

dealer or because they were thought to be a good fit for the crew. These members included Scott, Hayes, Ballard, Doggett, Segers, Anthony, Haines, Robinson, Stone, and Miller. Consideration of this evidence through the lens of the <u>Kelly</u> factors leads to the conclusion that there was sufficient evidence of an overarching conspiracy.

>    a.  *The First <u>Kelly</u> Factor*

Regarding the first <u>Kelly</u> factor, whether there was a common goal, the Government presented six cooperating witnesses, all who were integral conspirators, who explained in great detail that the purpose of each incident (with the exception of Platinum Jewelers) was to rob drug dealers of drugs and drug proceeds. These witnesses testified that drug dealers were deemed prime targets not only because they had drugs and money, but also because they were unlikely to call the police. As to Platinum Jewelers, Bowens testified that there was a "drought" of information regarding drug dealers they could rob, thus Smith proposed they target his personal jewelry store where he knew expensive items were stored in a safe.

Each incident—or "job"—proceeded in similar fashion with multiple Defendants having differing roles. Someone, whether it be a member of the group or an outsider who was friends with a drug dealer, brought "intelligence" to Smith or Woods regarding a "target." Smith or Woods then shared the intelligence with members of the "crew," who met on Lenox Street, Sydenham Street, or on the east side of Erie Avenue to discuss plans for the robbery. If the crew was unaware of where a target lived, a tracking device was placed on the target's vehicle. Once the location of the target's residence was established, various members of the crew performed "surveillance" on the residence to learn who went in and out of the home at what times, as well as neighborhood activity. This information was relayed to others and used to determine the

optimum time for the robbery. A date and time was selected,[14] and roles were assigned by Smith and/or Woods. Certain members of the conspiracy were "inside" guys who entered the house with weapons while others served as lookouts, monitoring a police scanner and the surrounding neighborhood from a car. Depending on the circumstances, the crew: burglarized the residence when nobody was home, robbed the residence when the target was home so that they could inquire where hidden drugs and money were located (a "home invasion"), or kidnapped a target outside of his home and used him as a pawn to get ransom money. Smith and/or Woods determined how many people were needed, and enlisted others accordingly.

Members of the conspiracy convened on Lenox Street before the planned event and drove together to the robbery, meeting any other members who had not gone to Lenox Street. Most often the conspirators wore dark colored clothing, hooded sweatshirts, masks, and gloves. The masks were either actual masks or t-shirt sleeves cut off and pulled over the face and paired with a hat. For the Platinum Jewelers, Mayfair Street, and Master Street jobs, the men wore fake police gear, as well as masks.

At least one member of the conspiracy always had a gun with them for the job in case they needed to use it on a target. Extreme violence was routinely used in home invasions to obtain information regarding the location of drugs and money. Conspirators came equipped with materials to tie up their victims—zipties or rope. In the event they did not have binding material handy, they used shoestrings found in their victims' homes. The conspirators demanded money and drugs, and then stole money, drugs, or whatever items of value they could find, including cars in three instances. They then fled the scene and met either on Lenox Street or at Woods's

---

[14] The one exception to this general course of action was the Ridge Avenue robbery. There, Bowens and Bellamy went to the residence on April 24, 2014 to conduct surveillance, but upon arriving realized nobody was home. It was then decided that the robbery would take place right then, and Smith, Woods, Hartley, and Munden joined Bellamy and Bowens. Surveillance had also been done in advance. (N.T. 3/21/17 P.M. at 32.)

apartment to "break down" the proceeds of the robbery, with Smith and Woods distributing each member's share depending on their role.

The fact that each incident proceeded in similar fashion demonstrates the common goal among the conspirators. Through Smith and Woods, two teams were brought together in various configurations to steal from drug dealers. Each conspirator participated with the same goal: obtain money and/or drugs that would generate money.

### b. The Second *Kelly* Factor

As to the second Kelly factor, whether the agreement contemplated bringing to pass a continuous result that would not continue without the ongoing cooperation of the conspirators, the Government provided ample evidence that this group operated like a snowball rolling downhill—accumulating people, robberies, and money from (at least) September 2012 through April 29, 2014. Bellamy and Bowens testified about seven and nine incidents respectively, explaining that the crew was always hunting for more victims. Bellamy explained that "everyone," including Smith, Woods, Munden, Hartley, and Jackson, met up on Lenox Street to discuss "what information [the group] might have on certain individuals, and [who] the next target might be." (N.T. 3/7/17 at 98, 100.) The conspiracy fed on information supplied by friends of drug dealers and incorporated those informants into the group as necessary. New information spawned the next robbery, and those who were invited into the group (Scott, Robinson, Ballard, and Hartley) often sought to provide more information so that they could participate in future robberies.

Although some members were involved in only one or two incidents, they knew that a single robbery was only part of the overall conspiracy in which other members played overlapping roles. Scott and Hayes testified about the crew's reputation for obtaining money

through robberies and their desire to join the crew so that they could share in the spoils. Scott explained that he provided information regarding the target on Railroad Avenue because he "needed money and [thus] needed to get in their circle." He further testified that after Bristol Street, he met with Woods, Smith, and Bowens to discuss possible future targets. (N.T. 2/13/17 at 143, 178.) Hayes testified that he entered the conspiracy for the Platinum Jewelers robbery through Queen because he needed money. (N.T. 2/15/17 at 122.) Both Scott and Queen testified that even after they were arrested and imprisoned, they maintained contact with co-conspirators. Scott continued to provide information for future robberies, and Queen remained in touch so that he could easily get back in the "loop" when he was released. (N.T. 2/14/17 at 12-13; N.T. 2/28/17 at 29.)

   *c. The Third <u>Kelly</u> Factor*

   Finally, turning to the third <u>Kelly</u> Factor, the extent to which the participants overlap in the various dealings, Bellamy and Bowens explained the nature of each conspirator's role. Smith and Woods were essentially co-leaders who brought their respective teams together for robberies. Smith and Woods decided the plans for a robbery, each participant's role, and who got what at the breakdown. The group was further augmented depending on the target, the number of other people in the target's house, and who could be present from the teams. Sometimes people who brought intelligence to the group were added to the robbery team (e.g., Scott, Ballard, Robinson, Miller). Some members of the group dropped off because of imprisonment or other responsibilities. For example, Jefferson, Scott, and Queen were all in prison at some point and could no longer participate in robberies; Jackson had to miss the Regent Street robbery because he had family obligations; and Bowens missed the Wyndale Avenue

robbery because he overslept.  That the membership of the crew changed is of no import because all members of the crew were connected to one of two endpoints: Smith or Woods.

In light of the above, I find that consideration of the three <u>Kelly</u> factors demonstrates that the Government presented sufficient evidence that a single conspiracy existed such that there was no variance.

### 2.  Woods, Munden, Hartley, and Jackson Joined the Conspiracy

There was more than sufficient evidence presented by the Government to establish that Woods, Munden, Hartley, and Jackson were all part of the conspiracy.[15]  As stated above, to establish a conspiracy, the Government must prove "[1] a unity of purpose between the alleged conspirators, [2] an intent to achieve a common goal, and [3] an agreement to work together toward that goal."  <u>Riggs</u>, 171 F. App'x at 964.  These elements may be proven through circumstantial evidence.  <u>Id.</u>

Ample evidence resulted in Woods being convicted of eight incidents: Cherry Hill, Master Street, Lansford Street, Pulaski Avenue, Mayfair Street, Regent Street, Ridge Avenue, and Wyndale Avenue.  Additional evidence established that while he was not present for the actual attempted robbery of Platinum Jewelers, Woods participated in its planning.  Both Bowens and Bellamy testified that Woods was the leader of one part of the crew, developing plans for robberies, bringing ideas for robberies (Cherry Hill, Lansford Street, Pulaski Avenue, Mayfair Street, and Regent Street), assigning roles for participants, and distributing the proceeds after the robberies, sometimes at his own apartment.  Miller testified that he brought the intelligence on Master Street to Woods and Munden "because he knew they would get the job done."  (N.T. 2/27/17 at 48.)  Like Smith, Woods met with other members of the crew almost

---

[15]    Smith did not join this argument thus I will not analyze whether there was sufficient evidence that he joined the conspiracy.

every day on Lenox Street, Sydenham Street, or around 10th and Erie Avenue.  A rational juror could certainly conclude that Woods shared the purpose of robbing drug dealers to obtain drugs and money with other members of the conspiracy, that he intended to achieve this goal, as evidenced by his involvement in bringing ideas to the group and participating in the planning of robberies, and that he agreed to work toward that goal with the others.

Equally compelling evidence tied Munden and Hartley to the conspiracy.  Bellamy testified that they were members of Woods's team, that Woods recruited them for the Regent Street robbery, and that they were present for conversations on Lenox Street where past targets, future targets, and roles were discussed.  Substantial evidence established that Munden was present for Master Street, Mayfair Street, Regent Street, Ridge Avenue, and Wyndale Avenue. Munden participated in the kidnapping of G.T. at Master Street and provided his garage as a location to hold the hostage.  At Mayfair Street, he participated in the kidnapping of O.T., and at Regent Street he went inside of the house and stood guard over I.C. while her husband was being brutalized.  Munden went inside of the house to ambush and rob O.W. at Ridge Avenue, and was also part of the crew that went inside at Wyndale Avenue where he was shot in the arm.

Considerable evidence also established that Hartley was present for Mayfair Street, Regent Street, Ridge Avenue, and Wyndale Avenue.  Like Munden, Hartley participated in the kidnapping of O.T. on Mayfair Street and went inside of the houses on Regent Street and Ridge Avenue.  Although he did not go inside of the house at Wyndale Avenue, Bowens and Bellamy testified that Hartley was a lookout and provided the intelligence for the robbery.  (N.T. 3/21/17 P.M. at 13; N.T. 3/7/17 at 264.)  There was sufficient evidence that Munden and Hartley shared the purpose of robbing drug dealers to obtain drugs and money with other members of the crew,

that they intended to achieve this goal, and that they agreed to work toward that goal with other conspirators.

Finally, as to Jackson, ample evidence connected him to the robberies on Pulaski Street and Mayfair Street where he served as a lookout. Bowens testified that Jackson and Bellamy served as lookouts for the Pulaski Avenue robbery, and that Jackson had the police scanner. Bowens explained that Jackson and Bellamy contacted the men inside at Pulaski Avenue to alert them when the homeowners arrived, and that Jackson was present afterward when the proceeds of the robbery were distributed on Lenox Street. Bellamy confirmed these details. (N.T. 3/21/17 A.M. at 50-51, 53, 61, 65; N.T. 3/7/17 at 179-80, 193, 194-95.)

As to the Mayfair Street incident, Bowens testified that after initial plans were made, Jackson was subsequently asked by Woods to participate because more people were needed to execute the planned kidnapping. The conspirators met before the incident to discuss the plans and brought Jackson up to speed. Bellamy testified that Jackson and Bellamy were again assigned lookout roles, and that Jackson had a police scanner and stayed behind to monitor the block after the other men had taken the victim to Munden's garage. (N.T. 3/21/17 A.M. at 74-75, 78, 95.)

Evidence was presented tying Jackson to two other robberies. Bowens testified that Jackson participated in the planning of the Regent Street robbery, and in fact would have been present had he not had a family conflict on the night of the robbery. Additionally, although he was not charged with the Wyndale Avenue incident, it was established that prior to April 29, 2014, Jackson received a text message from Woods containing an address two blocks away from the house targeted for the incident. Agent Sonnendecker testified that Jackson's phone was in

close proximity to the Wyndale Avenue address at the time of the robbery. (N.T. 3/21/17 A.M. at 108-09; N.T. 3/27/17 P.M. at 76-78; 3/22/17 P.M. at 46-50.)

Physical evidence further demonstrated Jackson's connection to the conspiracy. Jackson's fingerprint was found on the door handle of the white van in which Woods was pulled over following the Wyndale Avenue incident. When Jackson was arrested, ATF agents found a police scanner and binoculars inside of his vehicle. A search of one of Jackson's homes uncovered a holster and Philadelphia Police patch. (N.T. 3/7/17 at 149-52; N.T. 3/13/17 at 222-24, 227.)

Finally, Bowens testified that when Smith was arrested following the Wyndale incident, he (Bowens) participated in a three-way phone call with Smith and his girlfriend where Smith instructed his girlfriend to have Jackson look for his car near Wyndale Avenue. (N.T. 3/21/17 P.M. at 106-07.) Bowens also testified that following the Wyndale incident he obtained Woods's gun through Jackson who had retrieved Woods's vehicle. (N.T. 3/22/17 A.M. at 46.) Significantly, Bowens and Bellamy testified that Jackson was part of Woods's "team," and Bellamy testified that Jackson was present for discussions on Lenox Street where past targets and future targets were discussed.

All of this evidence established that Jackson shared the purpose of robbing drug dealers to obtain drugs and money with other members of the crew, that he intended to achieve this goal, and that he agreed to work toward that goal. Jackson's participation in at least two robberies and the planning of a third demonstrates his knowledge of the conspiracy's goals and actions. That he served as a lookout for two incidents demonstrates his intent to bring these goals to fruition and that he agreed to do so with other co-conspirators. That Jackson retrieved both Smith and

Woods's vehicles following their arrest after the Wyndale incident further confirms that he was part of the conspiracy.

### C. Sufficient Evidence Was Presented to Demonstrate that Smith Was Guilty on Count Sixteen (Carjacking, Leas Way) and that Smith, Woods, Munden, and Hartley Were Guilty on Count Twenty-Five (Carjacking, Regent Street)

Defendant Smith challenges the sufficiency of the evidence for his convictions on Counts Sixteen and Twenty-Five (18 U.S.C. § 2119, carjacking).  Defendants Woods, Munden, and Hartley join in this argument as to Count Twenty-Five.

A conviction under 18 U.S.C. § 2119 requires that a defendant "(1) with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force or intimidation."  United States v. Augustin, 376 F.3d 135, 139-40 (3d Cir. 2004) (citing United States v. Applewhaite, 195 F.3d 679, 684-85 (3d Cir. 1999)).

### 1. Count Sixteen (Leas Way)

Smith was found guilty of taking victim M.M.'s BMW in violation of 18 U.S.C. § 2119. Relying on the facts of United States v. Applewhaite, 195 F.3d 679 (3d Cir. 1999), he challenges the sufficiency of the evidence as to only the first element of § 2119 ("with intent to cause death or serious bodily harm"), contending that no evidence established that the force used against M.M. "had any nexus to the subsequent taking of his car."

"The intent requirement of § 2119 is satisfied when the Government proves that at the moment the defendant demanded or took control over the driver's automobile, the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car (or, alternatively, if unnecessary to steal the car)."  Holloway v. United States, 526 U.S. 1, 12 (1999); see also Applewhaite, 195 F.3d at 685.  The statute "directs the factfinder's attention to the

defendant's state of mind at the precise moment he demanded or took control over the car 'by force and violence or by intimidation.'" Holloway, 526 U.S. at 8. This requirement is satisfied where "the threatened or actual force is employed in furtherance of the taking of the car." Applewhaite, 195 F.3d at 686. This intent may be established "indirectly through [their] own actions, or through actions of [their] coconspirators." United States v. Johnson, 222 F. App'x 153, 155 (3d Cir. 2007) (citing United States v. Augustin, 376 F.3d 135, 140 (3d Cir. 2004)).

In Applewhaite, Defendant Lydia Romero called her estranged husband, Eddie Romero, and asked him to come to her home. Applewhaite, 195 F.3d at 682. Mr. Romero drove his van to Mrs. Romero's home that evening, and when he arrived, she instructed him to wait outside. Id. While waiting, Mr. Romero was knocked unconscious by three blows from behind and later awoke inside of his van, which was being driven by Defendant Victor McDene Applewhaite. Id. at 682-83. Driving with his left hand and holding a gun with his right, Applewhaite struggled against Mr. Romero who attempted to grab the gun. Id. at 683. Mr. Romero was shot as the two wrestled for the gun, and Applewhaite lost control of the van which crashed. Id. Following the crash, Applewhaite shot Mr. Romero twice more and ran from the scene. Id. Mrs. Romero and Applewhaite were later indicted. Id. At trial, Applewhaite admitted to hitting Mr. Romero with a baseball bat and that when he realized what he had done, put Mr. Romero in the van to transport him to the hospital. Id. at 683-84. Applewhaite testified that when Mr. Romero woke up in the van, he happened to be holding a gun when the struggle began. Id. at 684. The jury convicted Applewhaite of carjacking, and he appealed. Id.

The Third Circuit concluded that the mental state required to establish the intent element of a carjacking charge was not established at trial. Id. at 685. The court explained that while the Government had shown that Mrs. Romero and Applewhaite intended to harm or kill Mr.

Romero, "neither their evil intent, nor the force they employed in furtherance of it, had any nexus to the subsequent taking of his van." Id. While the evidence demonstrated that (1) force had been used to harm Mr. Romero, and (2) the van was taken, it did not show that the force was used to take the van. Id. Finding that the evidence demonstrated "the van was taken as an afterthought," the Third Circuit concluded that the Government had failed to "establish the required nexus between the assault and the taking." Id. The court rejected the Government's argument that the fact that Applewhaite used Mr. Romero's car to transport Mr. Romero's body away from the crime scene satisfied the intent requirement of § 2119. Id. at 685-86. The court explained:

> It simply makes no sense to suggest that [Mr. Romero] was assaulted so that the defendants could transport his body away from [Mrs. Romero's] home. The reason the defendants assaulted Romero was not to transport his body to his own car. Rather, the force was used solely for the purpose of bludgeoning Romero. That was the object of the assault. It was not the means of stealing his car.

Id. at 686.

Here, Bowens and Queen both provided testimony regarding Smith's intent in taking M.M.'s BMW. Bowens testified that when he arrived at M.M.'s home with Smith, Queen, Ballard, and Doggett, their intent was to steal drugs, money, and guns from the home. Queen testified that he, Smith, Ballard, and Bowens hid and waited for M.M. to come home. Queen, Smith, and Ballard all had their guns out as they waited. When M.M. arrived, they "attacked" him, grabbing him, slamming him on the ground, and securing him. Once he was secured, the men took his "key remote" from his person to gain entrance to his house. Unable to find any drugs or money, the men took electronics, guns, and personal items. Queen testified that when the men fled the house, M.M. was left tied up inside. Bowens put the stolen items in M.M.'s BMW and then drove the vehicle back to the city. The BMW ran out of gas on the highway, so

Bowens got a ride from Ballard and Doggett, leaving the BMW on the highway. Before he left, though, Bowens took a black backpack from the BMW. (N.T. 3/16/17 at 241-45; N.T. 2/28/17 at 101-07.)

M.M. also testified that when he got to his house on the morning of November 7, 2013, he parked his BMW in the driveway and pushed a remote control button to open his garage, intending to go into his house through the garage when people emerged from the bushes. Before carrying M.M. into his house, the men who approached him took the keys to the BMW from M.M's pocket. M.M. did not consent to the men taking his car keys, but testified that there was nothing he could do to prevent it. He did not recall seeing any weapons, but testified that he felt something on his side. (N.T. 2/27/17 at 243-45, 248-49.)

Based on Queen, Bowens, and M.M.'s testimony, it was reasonable for the jury to conclude that Smith and his cohorts possessed the intent to seriously harm or kill M.M. if necessary to steal his BMW. Bowens and Queen confirmed that three men had guns pointed at M.M. when they approached him in the driveway, and that M.M. was immediately assaulted and subdued. Unlike in Applewhaite, where the van was taken after the assault on Mr. Romero and there was no nexus between the assault and the car theft, M.M.'s car keys were taken either simultaneously to or just after the men assaulted him. M.M.'s testimony that he felt something touching his side and that he had no choice but to allow the men to take his keys demonstrates that the men would have used their weapons if necessary.

Additionally, when Smith and his cohorts arrived at M.M's home, the men intended to steal money, drugs, and guns, and as they ravaged through the home and were unable to locate those items, they expanded their scope to other items of value, including the BMW. I disagree with Smith's characterization of Bowens's theft of the BMW as an "afterthought." Rather,

Bowens took the BMW as part of the group's general scheme to steal items of value and to assist in the transportation of stolen items. Importantly, Bowens pilfered a black bag containing money and electronics from the BMW, and then only abandoned the BMW because it ran out of gas.

As the Government observes, "[t]hat the car was not on the defendants' 'list of specific things to steal' . . . does not mean that the defendants did not have the requisite intent at the time they deprived [M.M.] of his property." (Resp. at 60-61.) I find that a rational juror could certainly conclude that the men took M.M.'s car keys using force, and then stole everything they considered valuable while continuing to apply that force, including the BMW, demonstrating their intent to seriously harm or kill M.M. if necessary. Whether Smith or one of his co-conspirators took the keys is of no import, because intent may be established through co-conspirators' actions. See Augustin, 376 F.3d at 140.

2. Count Twenty-Five (Regent Street)

Smith, Woods, Munden, and Hartley were also found guilty of taking a Toyota Camry from victims I.C. and A.C. in violation of 18 U.S.C. § 2119. They argue that the Government presented insufficient evidence to demonstrate the first element of § 2119 ("with intent to cause death or serious bodily harm") and the fourth element ("from the person or presence of another") of § 2119.

Regarding the first element, Defendants contend that the evidence showed only that the Toyota Camry was taken "as an afterthought," and that "no nexus existed between the violence and the taking of the car." As stated above, the Government need only prove that "at the moment the defendant demanded or took control over the driver's automobile, the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car (or, alternatively, if unnecessary to steal the car)." Holloway, 526 U.S. at 12; see also Applewhaite,

195 F.3d at 685. The statute therefore "directs the factfinder's attention to the defendant's state of mind at the precise moment he demanded or took control over the car 'by force and violence or by intimidation.'" Holloway, 526 U.S. at 8.

Bowens and Bellamy testified regarding the taking of the Toyota Camry. They explained that Smith, Woods, Munden, Bowens, and McFarland entered the house on Regent Street, while Bellamy and Hartley remained outside as lookouts. Bowens further testified that Smith, Woods, Munden, Bowens, and McFarland applied brutal violence as they assaulted I.C. and A.C. and attempted to rob them. Bowens stated that after viciously assaulting the home's residents, the men who were present eventually concluded that they may have the wrong house or wrong person. Smith, Woods, Munden, Bowens, and McFarland decided to leave the house, but before going, checked the family car for any drugs or money. Bowens testified that they "took [the car] to check it" for drugs and money. It was Bowens who took the Toyota Camry after taking the car keys from inside of the house. Upon finding nothing in the car, Bowens abandoned it on a street in Southwest Philadelphia. Bellamy confirmed that Bowens took the Toyota Camry to look for a "stash box" inside. (N.T. 3/21/17 A.M. at 128-30; N.T. 3/8/17 at 232.)

Similar to the taking of M.M.'s BMW from Leas Way, Bowens took the Toyota Camry as part of the overall scheme to rob the homeowners' on Regent Street. The degree of violence used demonstrated the crew's intent to seriously harm or kill A.C. and/or I.C. if necessary to find the drugs and proceeds. As such, I find that a rational juror could have concluded that the Defendants possessed the requisite intent to cause serious bodily injury at the time that Bowens took the Toyota Camry. This is equally true for Hartley who aided and abetted the incident by acting as a lookout.

As to the fourth element of § 2119, Defendants assert that the Toyota Camry was not taken in the presence of I.C. and A.C. because the evidence showed that neither victim saw their car keys or car stolen.

The Third Circuit has stated that the language of § 2119, which states "from the person or presence" of the victim, "tracks the language used in other federal robbery statutes . . . such as 18 U.S.C. §§ 2111, 2113, and 2118." United States v. Lake, 150 F.3d 269, 272 (3d Cir. 1998) (quoting H.R.Rep. No. 102-851(I), at 5 (1992)). According to these statutes, "property is in the presence of a person if it is 'so within his reach, observation or control, that he could if not overcome by violence or prevented by fear, retain his possession of it.'" Id. (quoting United States v. Burns, 701 F.2d 840, 843 (9th Cir. 1983) (also quoting LaFave and Scott, *Substantive Criminal Law* § 8.11 at 443 (1986) ("'Presence' in this connection is not so much a matter of eyesight as it is one of proximity and control: the property taken in the robbery must be close enough to the victim and sufficiently under his control that, had the latter not been subjected to violence or intimidation by the robber, he could have prevented the taking.")).

The Government cites to United States v. Lake, 150 F.3d 269 (3d Cir. 1998), in support of its argument that sufficient evidence was presented for a jury to find that the fourth element of § 2119 was satisfied. In Lake, the defendant took the victim's car keys while pointing a gun at her, and then ran up a path toward the parking lot and drove off in her car. 150 F.3d at 272. The victim ran after the defendant but did not reach the parking lot in time to stop him. Id. On appeal, the defendant argued that the "from the person or presence of another" element of § 2119 had not been met because he took the keys from the victim's person or presence but the victim was not present (could not see or touch the car) when he took the car. Id. The Third Circuit rejected this argument, concluding that "a rational jury could have found that [the victim] could

have prevented the taking of her car if she had not been fearful that [the defendant would shoot or otherwise harm her." Id. The court cited to testimony that the sight of the defendant's gun had caused the victim "great fear," that the victim was "pulling herself together" when the defendant ran up the path, that the victim reached the parking lot in time to see the defendant driving her car away but not in time to stop him, and that she was very scared by then. Id. Based on this testimony, the court observed that a rational juror could have inferred that the victim hesitated due to fear, and had she not hesitated, she could have prevented the defendant from taking her car. Id.[16]

Here, Bowens testified that A.C. was tied up in the bathroom on the second floor of the house on Regent Street. A.C. was beaten, waterboarded, and doused with boiling water by Smith, Bowens, McFarland, and Woods as they demanded he tell them where the drugs and money were located. I.C. was forced to strip naked and get on her hands and knees as Smith threatened to sodomize her with a stick. A.C. was forced to watch this while bound. Eventually, the men determined that they had the wrong house and fled. Before leaving, though, Bowens stole the keys to the family's Toyota Camry and took the car. Bowens testified that the men inside of the house all had guns; in particular, Woods had a shot gun. (N.T. 3/21/17 A.M. at 111, 122, 125-29.)

A.C. testified to the same details, adding that he felt "terrorized," was concerned for he and his wife's safety, and thought they might be killed. (N.T. 3/2/17 at 51-66.) I.C. also

_____

[16]    The Government also cites to United States v. Lopez, 271 F.3d 472 (3d Cir. 2001). In Lopez, two victims were attacked and taken into a house where they were violently beaten and told they would be killed if they did not hand over their money. 271 F.3d at 477-78. The assailants also demanded that one of the victims turn over the keys to her van parked outside. Id. The jury convicted the defendants of carjacking. On appeal, the defendants argued that because the victim was inside and her van was outside, the evidence did not show that they took the car "from the person or presence of another." Id. at 486. The Third Circuit rejected the defendant's argument, applying the same reasoning as Lake. Id.

testified stating that the man who put his hand over her mouth (Munden) had a gun and told her he would kill her. She testified that she thought she was going to die. (N.T. 3/2/17 at 98-110.)

Just like the victims in <u>Lake</u> and <u>Lopez</u>, a rational jury could have found that I.C. or A.C. could have prevented the taking of the Toyota Camry if they had not been fearful that Smith, Woods, Munden, Bowens, and McFarland would harm them. This is equally true for Hartley who aided and abetted the violent attempted robbery by acting as a lookout. The car keys were in their home, and the car was parked just outside. Were A.C. and I.C. not bound and recovering from being tortured and threatened with rape, they could have prevented Bowens from taking the car keys and the Toyota Camry.

### D. Sufficient Evidence Was Presented to Demonstrate that Jackson and Woods Were Guilty on Count Twenty-One (18 U.S.C. § 924(c) and 18 U.S.C. § 2, Pulaski Avenue)

Jackson and Woods challenge the sufficiency of the evidence for their conviction on Count Twenty-One (carrying a firearm in relation to a crime of violence or drug trafficking crime). Citing to <u>Rosemond v. United States</u>, 134 S. Ct. 1240 (2014), they contend the conviction cannot stand because no evidence was presented showing that they possessed a gun for the Pulaski Avenue robbery, nor was any evidence presented showing that they had "advance knowledge" of the use of a firearm. The Government responds that Jackson and Woods's reliance on <u>Rosemond</u> is misplaced because (1) the jury could have reasonably found Jackson and Woods guilty under a <u>Pinkerton</u> theory of liability; and (2) the Court instructed the jury on the <u>Rosemond</u> requirement, and the Government presented sufficient evidence that Defendant Jackson had advance knowledge that a firearm would be used.

28 U.S.C. § 924(c) provides that "any person who, during and in relation to any crime of violence or drug trafficking crime[,] . . . uses or carries a firearm, or who, in furtherance of any

such crime, possesses a firearm" shall receive a five-year mandatory minimum sentence. If the firearm is brandished, the person is subject to a seven-year minimum. 18 U.S.C. § 2 states that "[w]hoever commits an offense against the United States or aids [or] abets . . . its commission, is punishable as a principal."

In Pinkerton v. United States, 328 U.S. 640 (1946), the United States Supreme Court held that the criminal act of one conspirator in furtherance of the conspiracy is "attributable to the other [conspirators] for the purpose of holding them responsible for the substantive offense." Lopez, 271 F.3d at 480 (quoting Pinkerton, 328 U.S. at 647). "A defendant is liable for substantive offenses committed by co-conspirators under a Pinkerton theory if (1) the defendant is a party to a criminal conspiracy, (2) one or more co-conspirators committed the substantive offense in furtherance of the conspiracy, and (3) commission of the substantive offense was reasonably foreseeable." United States v. Stubbs, 578 F. App'x 114, 117 (3d Cir. 2014) (citing United States v. Ramos, 147 F.3d 281, 286 (3d Cir. 1998)). The Third Circuit has found a defendant convicted of conspiracy to be liable under § 924(c) for his co-conspirator's use of a firearm in furtherance of the conspiracy so long as that act was reasonably foreseeable. See, e.g., United States v. Casiano, 113 F.3d 420, 427 (3d Cir. 1997); United States v. Gonzalez, 918 F.2d 1129, 1135 (3d Cir. 1990).

Here, Jackson and Woods were convicted of conspiracy in Count One, and as explained above, there was sufficient evidence for the jury to conclude that the conspiracy existed and that Jackson and Woods were members of the conspiracy. Thus, I need only determine whether there was sufficient evidence to conclude that Jackson and Woods reasonably foresaw the use of a gun by their co-conspirators.

As to Jackson, both Bellamy and Bowens testified that Jackson was a core member of Woods's team and the larger crew. Bellamy testified that Jackson was present for meetings on Lenox Street where the crew discussed past robberies and plans for future robberies. Almost every robbery charged in the superseding indictment was executed with the assistance of a firearm. As Bowens explained, a gun was necessary even for a burglary in case the homeowner came home, and certainly for a home invasion where the conspirators demanded that a target turn over drugs and money. (N.T. 3/16/17 at 151, 159, 165; N.T. 3/8/17 at 98-100.)

The Pulaski Avenue incident proceeded in typical fashion. Woods provided the group with intelligence on a drug dealer, and surveillance was done on the target and his house. Smith, Woods, Jackson, Bowens, and Bellamy met at the target's home January 27, 2014 and discussed who was going to go inside and what was going to happen once they were inside. Smith and Bowens entered the home through an upstairs window and then unlocked the front door for Woods to enter while Jackson and Bellamy remained outside as lookouts. Smith, Woods, and Bowens scoured the house for items to steal. At some point the target and his girlfriend arrived home, and Bellamy and Jackson called to alert the men inside. Smith, Woods, and Bowens ambushed the target when he entered the home and assaulted him. The men stole cocaine, approximately $10,000.00, and other items of value, and then fled. Bowens testified that Smith and Woods had guns with them "[b]ecause we're robbing drug dealers, so, you know, mostly we – so we could be ready for anything – if anything go wrong." (N.T. 3/21/17 A.M. at 46-57.)

In light of Bowens's testimony and the abundant evidence presented throughout trial regarding the use of firearms, a rational jury could have concluded that it was reasonably foreseeable that a firearm would be used to commit the Pulaski burglary (turned home invasion), an incident that was in furtherance of the overall conspiracy. That Jackson was aware that Smith

and Woods had firearms was a logical inference—Smith and Woods always brought firearms to a robbery, the group discussed the plans for the incident before executing it, and Jackson called the men inside to tip them off that the target had arrived home.

As to Woods, the victim, J.B., stated that upon entering his home, he was confronted by a man pointing a gun. J.B. further testified that when he was later on the ground, he saw two other men searching his house holding a hammer and a second firearm. (N.T. 3/1/17 at 96-104.) Bowens testified that Woods was carrying a gun. In light of this testimony, a rational jury could have concluded that either Woods was one of the men holding a gun or was aware that his two co-conspirators were carrying guns.

As to Jackson and Woods's contention that the Government did not present sufficient evidence to demonstrate that they had "advance knowledge" that a firearm would be used, I note first that a rational jury could have convicted both men under the Pinkerton theory discussed above. In any event, Jackson and Woods's convictions were also valid under Rosemond v. United States, 134 S. Ct. 1240 (2014), where the Supreme Court reiterated its previous holding that a person is liable under § 2 for aiding and abetting a crime if he "(1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." Id. at 1245. As to the requirement of an affirmative act, the Supreme Court found that this element is satisfied where a defendant participated in the underlying crime of violence or drug trafficking crime. Id. at 1247. Regarding the intent requirement, the Court held that "[a]n active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun." Id. at 1249. Thus the defendant must have had "advance knowledge" that a co-defendant was carrying a firearm, such that he could "attempt to alter that plan or, if unsuccessful, withdraw from the enterprise." Id. The Court explained that

while a defendant may not himself have brought a gun to the illegal activity, because he took part in the illegal activity knowing a gun would be present, he intended the commission of the § 924(c) offense (here, an armed robbery).  Id.

Here, the jury convicted Jackson on Count Twenty-One on either a Pinkerton theory or an aiding or abetting theory, as no evidence was presented that Jackson in fact was carrying a firearm himself.  If the conviction was not under a Pinkerton theory, Bowens's testimony regarding the planning of the Pulaski robbery before going inside, the abundant use of guns by the members of this conspiracy, and the fact that Jackson called Smith, Woods, and Bowens inside to alert them to the arrival of the target all permit a reasonable inference that a jury could draw: that Jackson had advance knowledge guns would be used, and that he assisted in the use of those guns when he tipped off the men inside.  The same is true for Woods as J.B. testified that two of the three men who were inside of his house had guns, and Bowens testified that Woods had a gun.  Thus a rational jury could have concluded that Woods was one of those men, or certainly that he had advance knowledge that his co-conspirators were carrying guns.[17]

### E. Sufficient Evidence Was Presented to Demonstrate that Smith, Woods, and Munden Were Guilty, As Respectively Charged, on Counts Two, Three, Six, Seven, Eight, Nine, Fifteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Four, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, and Thirty

Finally, in a supplemental motion, Smith contends that insufficient evidence was presented for him to be convicted of all other counts on which he was found guilty.[18]  Smith's

---

[17]     The jury instruction on this issue was taken directly from Third Circuit Model Criminal Jury Instruction No. 7.02 – Accomplice Liability; Aiding and Abetting.

[18]     Those counts are Counts Two, Three, Six, Seven, Eight, Nine, Fifteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-Two, Twenty-Four, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, and Thirty.  Woods joined this Motion, however, it relates to him only as to Counts Six, Seven, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Four, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, and Thirty.  Munden

Motion states only that he is "entitled to a judgment of acquittal . . . because the government failed to present evidence to prove the elements of each charge beyond a reasonable doubt."

Defendants' claims are bald and unsupported, falling far short of what is required for a Rule 29 Motion. Because it is Defendants' burden to establish insufficiency, a burden which they have not met, I will only briefly review the evidence presented by the Government.

Regarding Counts Two and Three (Railroad Avenue) – Scott testified about the plans and execution of the robbery, including the use of firearms, and prison calls between himself, Smith, and Jefferson about the robbery. Two victim witnesses testified, as did police personnel who reported to the scene. Scott identified Smith as one of the people who entered the house, and victim A.G. identified Smith as one of the perpetrators.

Regarding Counts Six and Seven (Cherry Hill) – Bowens testified about the plans for the robbery, victim H.H. testified regarding the details of the attempted robbery, and police personnel who reported to the scene provided further testimony. Physical evidence recovered from the vehicle in which Smith and Jefferson were arrested was presented, as were extractions from recovered cell phones. Bowens identified Smith as one of the men who attempted to rob H.H. and Woods as being present for the robbery but remaining in his vehicle.

As for Counts Eight and Nine (Platinum Jewelers) – Queen, Bowens, and Hayes all testified about the plans for the attempted robbery and the execution, as did the owner of the store and the woman working the day of the attempted robbery. Additionally, the Government played the store's surveillance video of the attempted robbery multiple times. Queen, Bowens, and Hayes all identified Smith as one of the men who entered the store.

---

also joined this Motion, although it pertains to him only as to Counts Twenty-Two, Twenty-Four, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, and Thirty.

Regarding Counts Fifteen and Seventeen (Leas Way) – Queen and Bowens testified regarding the plans and execution of the attempted robbery, including the use of firearms. The victim, M.M, testified about the robbery. Additionally, pole camera footage was presented showing Smith, Bowens, and Queen meeting on Lenox Street prior to the robbery and returning to Lenox Street afterwards. Cell site data was presented showing Smith's cell phone pinging near the spot where he met with Ballard and Doggett before driving to Leas Way. Queen and Bowens identified Smith as one of the men who ambushed M.M. and ransacked his house.

As to Counts Eighteen and Nineteen (Lansford Street) – Bowens and Bellamy testified regarding the plans and execution of the robbery, including the use of firearms. One victim witness testified. The Government also presented a surveillance video of the men entering the home, a AAA record for "Brian Bosket" (Woods's alias) for a car parked on Lansford Street, pole camera footage showing the group meeting on Lenox Street before and after the robbery, and cell phone data placing Smith's cellphone behind the apartment on Lansford Street at the time of the robbery. Bowens and Bellamy identified Smith and Woods as two of the men who entered the home.

Regarding Counts Twenty and Twenty-One (Pulaski Avenue) – Bowens and Bellamy testified about the plans and execution of the robbery. The victim, J.B., testified that he was assaulted when he arrived home and that two of the men were armed with guns. Pole camera footage was presented showing Woods, Bellamy, Bowens, Smith, and Jackson arriving on Lenox Street after the robbery on Pulaski Avenue. Bowens is seen removing a ladder from a car before the men part ways. Bowens and Bellamy identified Smith and Woods as two of the men who went inside of the house.

As for Count Twenty-Two (Mayfair Street) – Bowens and Bellamy testified regarding the plans and execution of the kidnapping. Victim O.T. testified about being kidnapped and his sister J.T. testified about receiving a ransom call. The Government also presented a surveillance video showing the kidnapping and pole camera footage showing Bellamy, Smith, and Bowens on Lenox Street before and after the robbery. Bowens and Bellamy both testified that Smith and Munden were two of the men who approached O.T. and Woods remained in his car as a lookout. They further testified that O.T. was brought to Munden's garage after he was kidnapped and then assaulted for several hours.

Regarding Counts Twenty-Four and Twenty-Six (Regent Street) – Bowens and Bellamy testified about the plans and execution of the attempted robbery, including the use of firearms. Victim witnesses I.C. and A.C. testified about the incident, and the Government presented pole camera footage showing Smith, Bellamy, Bowens, and Munden on Lenox Street before the robbery, and Munden dropping Bellamy off after the robbery. Bowens and Bellamy both identified Smith, Woods, and Munden as three of the men who went inside of the house. A.C. identified Munden as the man who held her downstairs at gunpoint.

As to Counts Twenty-Seven and Twenty-Eight (Ridge Avenue) – Bowens and Bellamy testified regarding the plans and execution of the robbery, including the use of firearms. Victim witness O.W. testified that multiple men robbed him and carried firearms. The Government also presented pole camera footage showing Bellamy, Bowens, and Smith on Lenox Street after the robbery. Bowens and Bellamy testified that Smith and Munden went inside and Woods remained in his car as a lookout.

Regarding Counts Twenty-Nine and Thirty (Wyndale Avenue) – Bowens and Bellamy testified about the plans and execution of the attempted robbery relayed to them, including the

use of firearms. In addition to a long list of items recovered from the white van and Smith's Cadillac following Woods and Smith's arrests, the Government presented DNA from inside of the house matching Munden's, DNA from inside of the white van matching Smith's, and DNA on several of the masks in the van matching that of Smith and Woods. Bellamy testified that Smith and Munden went inside of the house, while Woods remained outside.

Finally, as explained in Section II above, the Government presented cell site location information regarding the location of Defendants' cell phones in the vicinity of cell sites that were in close proximity to various crime scenes. This testimony placed Defendants within range of a cell site near a crime scene at the time of the incident. The Government also presented phone records detailing the call history between each Defendant before, during, and after many of the robberies.

To grant Defendants' Motion, I would have to discount the testimony of Scott, Bowens, Queen, Bellamy, and Hayes, and their identification of the Defendants. I would also have to disregard the identifications made and testimony offered by victim witnesses. This kind of weighing of evidence is impermissible. See Burks v. United States, 437 U.S. 1, 16 (1978) ("Even the trial court, which has heard the testimony of witnesses first hand, is not to weigh the evidence or assess the credibility of witnesses when it judges the merits of a motion for acquittal."); see also United States v. Casper, 956 F.2d 416, 421 (3d Cir. 1992) ("In determining whether evidence is sufficient, we will not weigh evidence or determine the credibility of witnesses.").

Accordingly, I will deny Smith, Woods, and Munden's Motion because they have failed to meet their burden of demonstrating insufficiency as to Counts Two, Three, Six, Seven, Eight,

Nine, Fifteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Four, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, and Thirty.

## V. THE RULE 33 MOTIONS

Pursuant to Federal Rule of Criminal Procedure 33, Smith, joined by Woods and Munden, filed a Motion for a New Trial, pressing the same arguments raised in the pending Motion for Mistrial. Because I discuss the Motion for Mistrial at length in Section III, I will not repeat my analysis here. Hartley, joined by Woods and Smith, also filed a Motion for a New Trial pursuant to Rule 33, pressing many of the issues raised in the Motion for Mistrial. As discussed in great detail in Sections II, III, and IV of this Opinion, the evidence of guilt as to these Defendants was overwhelming and thus a mistrial will not be granted. As such, even under the Rule 33 standard outlined below, I find Smith, Woods, Munden, and Hartley's arguments unpersuasive and will deny their Motion for a New Trial.

Jackson, joined by Woods and Munden, filed a motion pursuant to Rule 33. He raises the same arguments as in his Rule 29 Motion, again contending there was insufficient evidence for the jury to convict him on Counts One and Twenty-One. For the reasons discussed above in Section IV, even applying the Rule 33 standard, I will deny Jackson's Motion.

Finally, Hartley, joined by Woods and Jackson, has also requested a new trial under Rule 33 on grounds that I failed to make findings under United States v. James, 590 F.2d 575 (5th Cir. 1979), regarding the admissibility of co-conspirator statements, or made improper findings under James. I address this argument below.

### a. Legal Standard

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."

"Motions for a new trial based on the weight of the evidence are not favored. . . . Such motions are to be granted sparingly and only in exceptional cases."  Gov't of the V.I. v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987) (citing United States v. Martinez, 763 F.2d 1297, 1313 (11th Cir. 1985)).  After independently weighing the evidence, a new trial may be ordered only if "the verdict was contrary to the weight of the evidence" and "there is a serious danger that a miscarriage of justice has occurred-that is, that an innocent person has been convicted."  United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008).

### b.  Hartley's Motion

Hartley asserts that I either failed to make findings under United States v. James, 590 F.2d 575 (5th Cir. 1979), regarding the admissibility of co-conspirator statements, or made erroneous findings under James.  The Government responds that the co-conspirator statements were admissible and that a court is not required to hold a James hearing prior to admitting co-conspirator statements.

A co-conspirator statement may be admitted as an exception to the hearsay rule under Federal Rule of Evidence 801(d)(2)(E) if it meets three conditions: (1) there must be independent evidence establishing the existence of the conspiracy and connecting the declarant and the defendant to it; (2) the statement must have been made in furtherance of the conspiracy; and (3) the statement must have been made during the course of the conspiracy.  United States v. Ammar, 714 F.2d 238, 245 (3d Cir. 1983).

The Third Circuit instructs that before co-conspirator statements are submitted to the jury, the court must determine that the Government has "established the existence of the alleged conspiracy and the connection of each defendant with it by a clear preponderance of the evidence independent of the hearsay declarations."  United States v. Cont'l Grp., Inc., 603 F.2d 444, 457

(3d Cir. 1979).  The proponent of the co-conspirator statements must prove by a "clear preponderance of the evidence" that a conspiracy existed, the defendant and the declarant were members of the conspiracy, and the declarant "made the statement during the course and in furtherance of the conspiracy."  Ammar, 714 F.2d at 246.  The co-conspirator statements sought to be admitted under Rule 801(d)(2)(E) are not in and of themselves sufficient proof of "the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered," however, they may be used as evidence of such facts.  United States v. Gambino, 728 F. Supp. 1150, 1153-54 (E.D. Pa. 1989).

In James, the Fifth Circuit stated a preference for requiring the Government to establish the existence of a conspiracy and each defendant's participation in that conspiracy before admitting any co-conspirator statements for trial.   590 F.2d at 581-82.  The Third Circuit, however, has taken a different approach and emphasized that "the control of the order of proof at trial is a matter committed to the discretion of the trial judge."  Ammar, 714 F.2d at 246.  The Third Circuit has found that it was not an abuse of discretion for a trial judge to permit the Government to introduce co-conspirator statements without making a prior showing of conspiracy based on independent evidence, subject to the requirement that the Government make such a showing by the close of its case.  See, e.g., Cont'l Grp., Inc., 603 F.2d at 456.  Thus the Third Circuit does not require the Government to show a conspiracy's existence by a preponderance of the evidence before a co-conspirator statement is admitted.   Instead, "in complex trials involving a large amount of interrelated testimony, it may be necessary to admit the statements provisionally, subject to a later finding of a conspiracy established by the preponderance of independent evidence."  United States v. De Peri, 778 F.2d 963, 981 (3d Cir. 1985).  In a more recent but non-precedential case, the Third Circuit stated that "[t]he court may

conditionally admit evidence under Rule 801(d)(2)(E), provided the government makes the necessary showing *by the close* of its case." United States v. Onyenso, 615 F. App'x 734, 737 (3d Cir. 2015) (emphasis in original).

Prior to trial, Defendant Romel Anthony (who was severed and tried separately) filed a motion requesting a James hearing to determine the admissibility of co-conspirator statements (Doc. No. 271), which all Phase I Defendants joined. I held a hearing on January 24, 2017, at which the Government proffered how it would prove Count One through witnesses, telephone records, and search warrant evidence. The Government explained how Smith, Woods, Munden, Hartley, and Jackson were connected to the group, and how subgroups of people came together for each individual robbery. As permitted under Cont'l Grp., Inc., I denied Anthony's Motion without prejudice, explaining that I would defer ruling on whether a single conspiracy had been proved until the conclusion of the Government's case, and thus also the admissibility of co-conspirator statements. I found that the Government's proffer demonstrated it would be able to present sufficient evidence that a single conspiracy existed. (N.T. 1/24/17 at 28-33.)

As discussed at length above in Section IV, the Government presented sufficient evidence that a single conspiracy existed. As such, co-conspirator statements were properly admitted at trial.

## VI.  THE RULE 34 MOTIONS

Woods filed a motion pursuant to Federal Rule of Criminal Procedure 34 contending I lack jurisdiction over the offenses with which he has been charged. He presses this same argument in his Rule 29 Motion. I will address his argument here and deny his request for an arrest of judgment.

Hartley listed Rule 34 in the heading of his post-verdict motion, however, did not explain why he was entitled to relief under Rule 34.  Because Hartley has provided no basis on which a Rule 34 motion could be granted, I must deny his request for an arrest of judgment.

### a.  Legal Standard

Federal Rule of Criminal Procedure 34 states that "[u]pon the defendant's motion or on its own, the court must arrest judgment if the court does not have jurisdiction of the charged offense."

### b.  Woods's Motion

This is not the first time Woods has challenged my jurisdiction.  He filed a *pro se* habeas petition pursuant to 28 U.S.C. § 2241 during the pretrial phase of this case wherein he contended I lacked jurisdiction because he did not consent to such jurisdiction.  He also argued jurisdiction was absent because the alleged crimes took place outside "federal admiralty and maritime jurisdiction" and the United States Code is invalid.  I denied Woods's habeas petition at a hearing on December 29, 2016, which Woods appealed.

The Third Circuit reviewed my denial of Woods's habeas petition de novo and affirmed my Order, stating that "[t]he District Court's jurisdiction over appellant's criminal prosecution is indisputable."  (Dkt. No. 16-5766, Doc. No. 8.)

Although it is difficult to decipher, Woods appears to advance the same arguments here. I need not get into Woods's specific arguments because, as recognized by the Third Circuit, the Court plainly has jurisdiction over this matter.

Article III, § 2 of the Constitution reads in part:

The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;--to all cases affecting ambassadors, other public ministers and consuls;--to all cases of admiralty and maritime jurisdiction;--to

controversies to which the United States shall be a party;--to controversies between two or more states;--between a state and citizens of another state;--between citizens of different states;--between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.

Section 3231 of Title 18 of the United States Code provides that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." Here, the superseding indictment was brought pursuant to 18 U.S.C. §§ 1951, 2119, 1201, 846, 924(c), and 2, which are all laws of the United States over which this Court has jurisdiction.

To the extent Woods challenges the interstate commerce element of the Hobbs Act, the Supreme Court explained in Taylor v. United States, 136 S. Ct. 2074 (2016), that "the purely intrastate production and sale of marijuana is commerce over which the Federal Government has jurisdiction." Taylor, 136 S. Ct. at 2080. Thus, "if the Government proves beyond a reasonable doubt that a robber targeted a marijuana dealer's drugs or illegal proceeds, the Government proved beyond a reasonable doubt that commerce over which the United States has jurisdiction was affected." Id. at 2080-81. The Third Circuit follows this same rule. See United States v. Walker, 657 F.3d 160 (3d Cir. 2011); United States v. Orozco, 93 F.3d 105, 107 (3d Cir. 1996). The Government presented substantial evidence at trial that Woods and his co-Defendants targeted drug dealers for robberies in order to steal drugs and drug proceeds, meeting the requirements of Taylor. I therefore find that I have jurisdiction over this matter.

## VII. CONCLUSION

For all of the reasons discussed above, I will deny Defendants' pending Motions filed pursuant to Rule 29(a), 29(c), 33, and 34. I will also deny the pending Motion for Mistrial.

An appropriate Order follows.